### DAHL

v.

### NORTH AMERICAN CREAMERIES, Inc. et al.

Nos. 7383–84.

Supreme Court of North Dakota.

Dec. 16, 1953.

Fred J. Graham and J. B. Graham, Ellendale, and H. I. King, Jr., Aberdeen, S. D., for plaintiff-appellant.

T. L. Brouillard, Ellendale, and Ray F. Williamson, Aberdeen, S. D., for defendants-appellants.

GRIMSON, Judge.

On March 25, 1952, a collision occurred between a car driven by Maynard Dahl and a truck of the defendant, the North American Creameries, Inc., driven by the defendant, James McPhail. In that collision both the father and mother of the plaintiff received fatal injuries. They died within two days. Plaintiff was their only child. Two actions were brought by the plaintiff against the same defendants for damages, one for loss of plaintiff's mother and the other for the loss of plaintiff's father. The titles of both actions are indentical. In both actions plaintiff alleges the collision was caused by the negligence of the defendant, James McPhail. Defendants deny that and allege the collision was caused by the negligence of Maynard Dahl. The cases were tried separately to two different juries. Substantially the same evidence was offered in both cases. The same procedure was had; the same motions and the same rulings were made in each case. The district court decided both cases in one memorandum opinion. The same issues are involved on the appeals in both cases. The cases were argued together in this court. It is most expedient, therefore, to consider both cases in one opinion, treating separately only the facts and damages pertinent to each case.

At the close of the testimony in each case the defendants made a motion for a directed verdict in their favor on the ground of the insufficiency of the evidence which motions were denied. The jury in the case for damages on account of the mother's death rendered a verdict on Oct. 13, 1952, in the sum of $7500 in favor of the plaintiff and the jury in the case of the damages for the father's death rendered a verdict, on Oct. 15, 1952, for $10,000. Immediately upon the announcement of the verdict in each case the defendants made an oral motion for judgment notwithstanding the verdict upon the same grounds as had been alleged in the motions for directed verdict, or in the alternative, for a new trial on the grounds that the verdicts were patently excessive and rendered under the influence of passion and prejudice. In both cases the attorneys expressed a desire to be heard on those motions. About a month later a written notice of motion and a written motion to set aside the verdict and for a new trial together with specifications of error in each case were served upon plaintiff's attorneys. A hearing on all these motions was had on Dec. 4, 1952. On Jan. 23, 1953, the court filed his memorandum decision covering both cases, granting a new trial in each case on the ground "that the verdicts are so excessive that the court can reach but one conclusion and that is that the verdicts were rendered under the influence of passion and prejudice." A separate order granting the motion for a new trial in each case was signed by the court on Jan. 29, 1953. On Feb. 27, 1953, an amended order in each case was signed by the court denying the motions made for judgment notwithstanding the verdict and again granting a new trial in each case. The defendants appeal from the orders of Feb. 27th., insofar as they denied the motions for judgment notwithstanding the verdict. Plaintiff appeals from the orders of Jan. 29th granting new trials and also from the amended orders of Feb. 27th insofar as they purported to grant new trials.

The evidence shows that in the afternoon of March 25, 1952, Mr. and Mrs. Maynard Dahl and their ten year old daughter, Nancy Louise, of Ellendale, North Dakota, were returning home from a trip to Britton and Aberdeen, South Dakota, on U. S. Highway No. 281. That was a quite level highway, black top, 22½ feet wide. A heavy fall of snow had formed drifts across the highway. To keep the highway open for travel cuts had been made through those drifts with a snow plow. Such cuts varied somewhat in width and the snow banks along the cuts were in places from four to seven feet high. In one of those cuts on the highway, which was some 400 feet or more in length, a collision occurred between the 1941 Ford driven by Maynard Dahl, and an International K.B.-11 tractor trailer combination owned and operated by the defendant, North American Creameries Company, Inc. and driven by Defendant, James McPhail. That combination was 44½ feet long, 8 feet wide,

weighing empty, 25,000 lbs., and at the time was carrying an 11,000 pound load. It had dual wheels on the rear of the tractor and tandem dual wheels on the rear of the trailer. The Ford was 6 feet wide.

The Dahl car coming from the south entered the cut first and was almost through it before the collision occurred. The defendant's truck came from the north. The driver, McPhail, had driven through other cuts prior to reaching this one and had had to stop in one place to let a car that was in a cut get through before he entered it. He testified that he saw the Dahl car when it was at least a half mile away from him. He saw it enter the cut and almost reach the north end before he entered the cut. He did not, however, wait to let the Dahl car get through. Instead he proceeded into the cut at the admitted speed of 35 to 40 miles per hour to where the collision occurred about 50 feet from the north end. He made no effort to stop or put on the brakes. The sun had been shining that day and there was some slush and snow in the bottom of the cuts causing the road there to be somewhat slippery. McPhail claims to have been driving on the right hand side of the road, and that the front end of the Dahl car had swerved over across the center line into his side of the driveway just before the collision occurred. Nancy Louise was sitting on the left front seat of the Dahl car looking at the snow banks. She denied that her father's car had swerved and testified that her father was driving straight ahead on his side of the highway at a speed of 20 to 25 miles per hour. McPhail claims he was driving 35 to 40 miles per hour; that he turned into the snow bank on the right side to try to avoid the collision; that his trailer then began to jacknife; that he put on the power to get out of the snow to straighten it; that he then applied his brakes and stopped about 350 feet from the point of the collision. The momentum of the Dahl car carried it 50 feet north after the collision where it stopped facing west with its front wheels on the center of the road. The pictures taken of the Dahl car after the accident show that the left side of the Dahl car was caved in. The left front fender of

the truck was crushed, left rear tire and the left driving wheel were damaged and there was "quite a dent" made in the left, front corner of the trailer. The plaintiff testified that at the place of collision the snow bank on the east was 6 or 7 feet high. The defendant, McPhail, testified that the snow bank on the west was 3½ to 4 feet high. The evidence is in conflict as to the distance between the banks. Three witnesses for the plaintiff testified that the width, according to their estimate was 15 to 18 feet. Shortly after the collision the highway patrolman, a witness for the defendants, measured the width with a tapeline, claiming the distance between the banks was 21 feet "on the tape." The patrolman had McPhail, the interested driver, hold one end of the tape. Whether that was the distance between the banks as they were after McPhail had driven his truck into the snow bank and naturally widened the space between the banks is not shown.

■ The decision on a motion for judgment notwithstanding the verdict is but deferred action on the motion for a directed verdict made at the close of the evidence. The decision is made on the evidence as it stood at that time. On such motions the evidence is considered in the light most favorable to the verdict. Bormann v. Beckman, 73 N.D. 720, 19 N.W.2d 455; La Bree v. Dakota Tractor & Equipment Co., 69 N.D. 561, 288 N.W. 476. The motion for judgment notwithstanding the verdict can only be granted if at the time of the motion for directed verdict the party making such motion was entitled to a judgment as a matter of law. Weber v. United Hardware & Implement Mutuals Co., 75 N.D. 581, 31 N.W.2d 456. Such party would not be entitled to such judgment if there was any conflict in the evidence upon which a jury should pass. In Nelson v. Scherling, 71 N.D. 337, 341, 300 N.W. 803, 804, this court said:

"On a review of an order denying a motion for judgment notwithstanding the verdict, this court is limited to a consideration of the evidence. If the record is such that there was some issue of fact to submit to the jury, and

the jury rendered a verdict thereon, then it is clear the motion for judgment notwithstanding the verdict should be denied." See also Aetna Indemnity Co. v. Schroeder, 12 N.D. 110, 95 N.W. 436; Cunningham v. Great Northern Railway Co., 73 N.D. 315, 14 N.W.2d 753; Zink v. Lahart, 16 N.D. 56, 110 N.W. 931; State Bank of Maxbass v. Hurley Farmers Elev. Co., 33 N.D. 272, 156 N.W. 921.

The evidence discloses that there was a conflict as to the width of the cut in which the collision occurred; as to whether or not the Dahl car swerved to his left side of the road, and as to the speed at which the Dahl car was going. The evidence raises the question as to the speed with which defendant's truck was being driven. There is a dispute as to whose negligence was the proximate cause of the injury. Clearly there is evidence to warrant the submission of the case to the jury. Defendants were not entitled to judgment as a matter of law. There was no error in the denial of the motions for judgment notwithstanding the verdicts.

 On the motions for a new trial defendants filed written specifications of error. Among them were some specifications of errors at law in the admission of testimony and in the instructions of the court to the jury. Such specifications of error, however, were not argued on appeal, and will be deemed abandoned. Then the specifications go into some detail in regard to defendants' claim of insufficiency of the evidence to show that the negligence of McPhail was the proximate cause of the collision. They also assert that the evidence was insufficient to warrant the amount of damages awarded and alleges that the damages were awarded under the influence of passion and prejudice.

Sec. 28–1906, NDRC 1943 provides:

"With all orders granting or refusing a new trial, the judge shall file a written memorandum concisely stating the different grounds on which his ruling is based, and unless the insufficiency or unsatisfactory nature of the evidence is expressly stated in such memorandum as a reason for granting the new trial, it shall be presumed, on appeal, that it was not on that ground."

The court did write a memorandum on granting the new trials. The grounds for granting the new trials as stated by the court in that memorandum are as follows:

"Under the evidence offered by the plaintiff the verdicts are so excessive that the court can reach but one conclusion and that is that the verdicts were rendered under the influence of passion and prejudice."

The court does not make any reference in his memorandum to the claimed insufficiency of the evidence to show that the negligence of the defendants was the proximate cause of the collision. It will be presumed, therefore, that that was not ground for the granting of a new trial. The only ground mentioned by the court in his memorandum for granting the new trials was that the verdicts were so excessive that he concluded they were rendered by the jury under the influence of passion and prejudice. Only the evidence and law bearing on that question will be considered.

On the appeal plaintiff specifies as error the granting of the motions for new trials on the grounds that the damages awarded were excessive and further that the court abused his discretion granting new trials on that ground.

 This action is brought under Sec. 32–2101, NDRC 1943, providing that damages may be recovered when the death of a person is caused by the wrongful act, neglect or default of another in cases when such person or corporation would have been liable for damages if death had not ensued. Sec. 32–2102, NDRC 1943 provides:

"In an action brought under the provisions of this chapter, the jury shall give such damages as it finds proportionate to the injury resulting from the death to the persons entitled to the recovery."

The rights of action in such matters being entirely statutory the statutory rule is the only measure of damages. Under the statute the amount of damages is left entirely with the jury except that the damages shall be proportionate to the injury resulting from the death to the person entitled to recover. In an action for damages for wrongful death it is the province of the jury, under proper instruction from the court, to determine the amount of the damages from the facts and circumstances of the case before it. The jury in fixing the damages has a wide range of discretion.

In Schumacher v. Storberg, 69 S.D. 103, 7 N.W.2d 141, 143, the court says:

"Appellants stress the lack of proof of damages, claiming that the verdict was excessive. The amount of damages to be recovered in a death case under our holdings seems to be a matter to be left to the fair and intelligent judgment of the trial jury, as no exact formula and standard can be definitely prescribed to measure the exact amount of damages. (Citing cases.) In Bottum v. Kamen, 43 S.D. 498, 180 N.W. 948, this Court held that there was no mathematical rule or formula by which damages in this class of cases must or should be computed by courts or juries, and that the jury might draw inferences from material matters shown by the evidence and thereby arrive at reasonably and approximately the correct amount of damages in cases where computation of such damages are practically incapable of proof by direct evidence."

In 5 Sutherland on Damages, 4th Ed. § 1267 p. 4893, it is said:

"The jury is not confined in estimating the damage to any exact mathematical calculation, but is vested with considerable discretion, with which the courts will not interfere unless it has been abused."

The defendants contend that the pecuniary value of the services lost by the injured person is the measure of damages. Many courts, including this court, have held that the pecuniary value of that which the beneficiary could expect to receive from the person on account of whose death the action was brought may be considered by the jury in determining the damages. Stejskal v. Darrow, 55 N.D. 606, 215 N.W. 83, 53 A.L.R. 1096. That does not allow the consideration of any damages by way of solatium for the injured person for loss of affection and injured feelings, nor does it allow the consideration of any damages by way of punishment of the wrongdoer. It does, however, allow the jury to consider any services of monetary value to the beneficiary no matter how difficult of appraisement.

This court, speaking through Judge Christianson, in Umphrey v. Deery, 78 N.D. 211, 218, 48 N.W.2d 897, 905, concluded that:

"The term 'pecuniary' as applied to damages allowable under a death statute has been considered by legal writers and by the courts of last resort in many jurisdictions. In some of the states the term 'pecuniary' occurs in the statute providing for an action for wrongful death thus restricting damages recoverable in such action to pecuniary injuries or pecuniary losses, and where the term 'pecuniary' is found in the statute the courts have held that it should not be construed or applied in a strict narrow sense and as meaning only the immediate loss of money or property. 5 Sutherland on Damages, 4th ed., p. 4859; Tilley v. Hudson River R. Co., 24 N.Y. 471, 475–476; McIntyre v. New York Central R. Co., 37 N.Y. 287; The St. Lawrence and Ottawa Railway v. Lett, 11 Can Sup. Ct.Reps. 422. And obviously the term 'pecuniary' should not be given a more narrow or restricted meaning where it is in effect inserted in the statute by judicial interpretation than where it has been inserted in the law by the lawmakers."

Tiffany in his work on Death by Wrongful Act, 2d Ed. § 158, p. 332, says:

"The use of 'pecuniary' to designate the kind of loss for which recovery can

be had is misleading, for the damages are by no means confined to the loss of money, or of what can be estimated in money. * * * The word has been used rather for the purpose of excluding from the recovery damages to the feelings and affections than of confining the damages strictly to those injuries which are 'pecuniary' according to the ordinary definition."

In 16 Am.Jur. § 182, Death, p. 122, it is said:

"The word 'pecuniary' where it occurs in death statutes, is not used in a sense of the immediate loss of money or property. It looks to prospective advantages of a pecuniary nature which have been cut off by the premature death of the person from whom they would have proceeded. Pecuniary loss is, therefore, not dependent upon the actual earning of money or money's worth or contributions to the support of the beneficiaries at or before the date of the death, where there was a reasonable expectation of pecuniary benefit from the continuance of the life. It consists not only of the loss of financial assistance which the beneficiaries might reasonably be expected to have received from the deceased had his career not been shortened by the act of the defendant, but also the loss of other things which have a pecuniary worth. See also McIntyre v. New York Central R. Co., 37 N.Y. 287, 295. See Annotation 74 A.L.R. 95 and cases cited."

Thus it is generally held that damages, even under the pecuniary construction of the measure of damages, are not limited to damages from the loss of money or income. The loss of any and all services which a child would probably have received from his father or mother may be considered by the jury in determining the verdict.

In determining the amount of damages to the plaintiff the jury had a right to consider the value of the nurture and instruction, moral and physical, the training and protection which a father or mother gives to their child. See Annotation 74 A.L.R. 95 and cases cited.

The jury in considering the loss to the plaintiff by the death of the father or mother is not limited to the time during which she is a minor if it can conclude from the evidence that such services would have continued after she attained her majority. There is no such limitation in the statute nor is there any such limitation in the value of the mother's service or a father's protection to a daughter at the critical period of her life when she is about to enter the more or less distinct and separate life upon attaining her maturity. Damages are not restricted to the loss of benefits to which plaintiff had a legal right. Texas & Pacific R. Co. v. Wilder, 5 Cir., 92 F. 953; Redfield v. Oakland Consolidated Street Ry. Co., 110 Cal. 277, 42 P. 822, 1063; Peters v. Southern Pacific Co., 160 Cal. 48, 116 P. 400; Bond v. United RR's of San Francisco, 159 Cal. 270, 113 P. 366, 48 L.R.A.,N.S., 687; Tilley v. Hudson River R. Co., 29 N.Y. 252, 86 Am.Dec. 297; See also Annotation 74 A.L.R. 111. The jury also had a right to consider the reduced purchasing power of the dollar. Dedman v. McKinley, 238 Iowa 886, 29 N.W.2d 337.

The memorandum decision of the district court discloses that in passing on the amounts of the verdicts he based his conclusion solely on the loss of the present monthly income of the father and during her minority. He writes:

"The evidence in the matter of damages is not in dispute. The father and mother at the time of their demise were about 50 years of age. The father had accumulated no substantial amount of property at the time of his death. There is no evidence of separate property on the part of the mother, nor is there any evidence relative to the earning capacity of the mother. It was evident that the father was dependent upon his daily labor for the support of himself, his wife and his daughter, and that his income was about $40.00 per week. The evidence further discloses that the cost of the

care and education of the plaintiff until she reaches maturity would be about $50.00 per month. According to the expectancy tables the court would be justified in assuming that if no accident had occurred the father and mother would both have lived until after the maturity of the daughter. The jury in the case involving the mother brought in a verdict of $7500.00 and in the case of the father a verdict of $10,000.00. There was but one child, the plaintiff in these actions, who at the time of the death of her parents was between 10 and 11 years of age. If the father had lived with an earning capacity of about $2000 a year, out of this sum he would have had to support himself, his wife and his daughter. Under the verdicts as rendered, if the money was placed to yield a small rate of interest such as a savings bank would give, the verdicts would afford the plaintiff during her minority more than $2000 annually, in fact, more than the total earning capacity of the father, under the evidence."

It is clear that only such monetary value of the services of plaintiff's father and mother as could be mathematically computed were considered by the court. There is no reference to the training, the care and nurture given by a mother to her daughter, nor to counselling and special protection the plaintiff would receive from her father and mother during her formative years, nor to their services for her in securing education and preparation for her future life. Had the court considered those matters he would have found more grounds for the juries' verdicts.

## The Damages and Verdict in the Mother's Case.

The evidence in the case shows that plaintiff's mother was 48 years of age and had a life expectancy of 22.36 years. That she was keeping house for the plaintiff and plaintiff's father in the house provided by the father. At the time of the accident plaintiff was 10 years old. The evidence shows she was then in the 5th grade. That shows she was advanced for her age and indicates the care and the interest of her mother in keeping her in school. That indicates also the attitude of the mother to provide for the plaintiff the training and education which would make her better able to meet the problems of life as they arose. The plaintiff had a right to look forward to that care, advice and counsel for the 22.36 years of normal expectancy of her mother's life whenever she needed it. The jury is not limited in determining the value of a mother to the plaintiff to the services and care that would be given to the plaintiff by hired substitutes. No one can take the place of a good mother in the development of a child.

"It has frequently been held, however, that damages are not confined to the loss of such education as is procurable only by pecuniary means, but that they may be given for the loss of the personal care, training and instruction of a parent, and even of a mother where father still survives." Tiffany, Death by Wrongful Act, 2d ed. § 162, p. 344.

"It is certainly possible, and not only so, but highly probable, that a mother's nurture, instruction, and training, if judiciously administered will operate favorably upon the worldly prospect and pecuniary interests of the child * * * If they (the children) acquire health, knowledge, and a sound bodily constitution, and ample intellectual development under the judicious training and discipline of a competent and careful mother, it is very likely to tell favorably upon their pecuniary interests." Tilley v. Hudson River R. Co., 24 N.Y. 471; Id., 29 N.Y. 252, 86 Am.Dec. 297.

The jury awarded to the plaintiff $7500 for the loss of her mother from whom she had a right to expect that training only a mother can successfully give. If that is apportioned among the next ten years of her life when plaintiff is in most need of that training it only amounts to an average of $750 a year or about $2.10 a day. Cer-

tainly a mother's loving care, training and counsel is of more value than that over and above the care any stranger could give her, even when figured on the basis of pecuniary value. It will make her a stronger and abler young woman. All this the jury had a right to consider. To us the verdict does not seem unreasonable.

### The Damages and Verdict in the Father's Case.

The testimony shows that the father, Maynard Dahl, was 46 years of age; that for about three years prior to his death he had been working in a hardware store at an average weekly pay of $40 per week; that the employer would have continued him in that employment; that he maintained a home for his wife and daughter in Ellendale. The evidence further shows that he had the interest of a father in the welfare of his daughter. The fatal trip to Britton, South Dakota, was taken to obtain treatment for the plaintiff with a Dr. Graff. There is no claim that the father was not in good health. His life expectancy was 23.80 years.

The plaintiff had a right to expect from her father not only support by the way of nurture, clothes and housing but also the care and protection of a father. She is deprived of that. Those are services that cannot be supplied as well by anyone other than the father. Every young girl now has the right to expect her father to provide her special training along whatever line of work she plans to enter. All these services are certainly of pecuniary value to a growing child. The presumption is that the plaintiff would have those valuable services from her father during her growth and development and even after that as she might need them during his life expectancy.

In Umphrey v. Deery, 78 N.D. 211, 48 N.W.2d 897, 899, this court held:

"In an action for the benefit of the surviving wife and surviving minor children for the wrongful death of the husband and father who had been discharging his obligation to support his wife and children and was discharging such obligation at and immediately prior to his death, it will be presumed that such surviving wife and surviving minor children sustained a substantial pecuniary loss from the death of the husband and father."

"The law will imply a pecuniary loss in some amount to the wife and children by the death of the husband and father who was at the time employed and presumably receiving wages, and therefore able to discharge his obligation to support them. The presumption is in favor of substantial damages." 5 Sutherland on Damages, 4th ed. § 1267, p. 4894.

"A presumption of pecuniary loss exists in favor of one legally entitled to service or support from one killed by the wrongful or negligent act of another. Where the relation of husband and wife, or of parent and minor child exists, the law generally presumes a pecuniary loss to the survivor from the fact of death so that proof thereof is not required, unless he has in some way forfeited his claim". 25 C.J.S., Death, § 118, pages 1284–1285.

Plaintiff's damages on account of the loss of such services and training are elements the jury had a right to consider. The pecuniary value of the loss of the support, protection, and counsel of her father and of the special training she had a right to expect was a matter for the jury to determine. The jury may also consider the possibility that Maynard Dahl might be able to better his position with continued service in the hardware business. Kennelly v. Northern Pacific Railway Co., 48 N.D. 685, 700, 186 N.W. 548.

The evidence shows that the support of plaintiff now costs $600 per year and that that cost will increase greatly as she advances in school, especially if she enters college. Add to that the value of the services, protection and education that would be provided by the father the verdict of $10,000 does not seem unreasonable.

## The Granting of New Trials.

 The district court granted new trials on the grounds that the verdicts were influenced by passion and prejudice. The plaintiff claims the court abused his discretion in so doing.

The court has power to grant a new trial for excessive damages only if it appears that the verdict was given under the influence of passion and prejudice. Sub. Sec. 5, Sec. 28–1902, NDRC 1943.

A verdict will not be disturbed on that ground unless the amount of damages is obviously so disproportionate to the injury as to justify the conclusion that the verdict is not the result of the cool and dispassionate judgment of the jury. This court in Umphrey v. Deery, 78 N.D. 211, 219, 245, 48 N.W.2d 897, 915, says:

"In actions for damages for wrongful death the jury is vested with a large discretion in fixing the amount of damages. 25 C.J.S., Death, § 115, p. 1265; 5 Sutherland on Damages, 4th ed., pp. 4892–4894, and while the discretion of the jury in such cases is subject to the supervision of the court, a verdict may be interfered with on the ground of excess only where it is manifest that the amount awarded is not within the evidence and was influenced by passion or prejudice. NDRC 1943, 28–1902; Whaley v. Vidal, 27 S.D. 642, 132 N.W. 248; Whaley v. Vidal, 27 S.D. 627, 132 N.W. 242; 25 C.J.S., Death, §§ 115, 116, pages 1266–1267."

The burden is on the party seeking a new trial to show effectively and satisfactorily that the verdict is excessive and to what extent. "The amount, so it is said, must appear to be unreasonable or outrageous, or such as to manifest, on the part of the jury, mistake, misapprehension of duty, or misconduct, indicating that they were influenced by passion and prejudice." 39 Am.Jur. New Trial, § 144, p. 150.

"In order to justify the granting of a new trial on the ground that the amount of the verdict is excessive, the fact that the award is excessive must be plain or evident. It is not sufficient for the party seeking a new trial merely to raise a doubt as to whether the damages are too large, he must show affirmatively and satisfactorily, that they are so and to what extent. The amount, so it is said, must appear to be unreasonable or outrageous, or such as to manifest, on the part of the jury, mistake, misapprehension of duty, or misconduct, indicating that they were influenced by passion or prejudice." 30 Am.Jur. § 144, p. 150.

"Only where the award appears to be unconscionable or clearly not warranted by the record, should the judgment of the jury, in such matters, be disturbed." Dunham v. Des Moines Ry. Co., 240 Iowa, 421, 35 N.W.2d 578, 583, 584.

What warrants setting aside a verdict? The formula which has been most frequently used is to the effect that to warrant interference the verdict must be so flagrantly outrageous and extravagantly excessive as to appear, at first blush, to have been given under the influence of passion, prejudice or corruption. See Brown v. Beck, 63 Cal.App. 686, 220 P. 14; Weaver v. Shell Oil Co., Cal.App., 49 P.2d 857; Bond v. United Railroads, 159 Cal. 270, 113 P. 366, 48 L.R.A.,N.S., 687; Varcoe v. Lee, 180 Cal. 338, 181 P. 223; Aldrich v. Palmer, 24 Cal. 513, 516; Doolin v. Omnibus Cable Co., 125 Cal. 141, 144, 57 P. 774; Anderson v. San Francisco-Oakland Terminal Railways, 61 Cal.App. 21, 214 P. 289; Redfield v. Oakland Consol. St. Railway Co., 110 Cal. 277, 42 P. 822, 1063; Tedford v. Los Angeles Electric Co., 134 Cal. 76, 66 P. 76, 54 L.R.A. 85; 13 Cyc. 123.

There is no evidence in the case at bar of any acts or circumstances indicating passion or prejudice on the part of the jury in either case. The District Court cites only the amounts of the verdicts as indicative thereof. We are all agreed that these verdicts are not so large as to show on the face of them that they are the result of passion and prejudice.

"The value of the counsel, advice, guidance, loving care, and solicitude of both mother and father would be difficult of ascertainment in money and must be left to the sound judgment of a jury, where it is not shown that such judgment was swayed beyond reason and common sense by passion or prejudice." Halbrook v. Williams, 185 Ark. 885, 50 S.W.2d 243, 245.

The District Court erred in granting new trials on the grounds of excessive verdicts. The orders of the District Court setting aside the verdicts and granting new trials are reversed and the cases are remanded with directions to re-instate the verdicts and judgments originally entered.

MORRIS, C. J., and CHRISTIANSON, SATHRE and BURKE, JJ., concur.