The **MERCHANTS NATIONAL BANK AND TRUST COMPANY OF FARGO, a corporation, as Administrator and Personal Representative of the Estate of Eloise A. Newgard, Deceased, Plaintiff,**

v.

**UNITED STATES of America, Defendant.**

**Civ. No. 4185.**

United States District Court
D. North Dakota,
Southeastern Division.

Sept. 11, 1967.

As Corrected Oct. 16, 1967.

John D. Kelly and Myron H. Bright, of Wattam, Vogel, Vogel, Bright & Peterson, Fargo, N. D., for plaintiff.

John O. Garaas, U. S. Atty., Kermit Edward Bye, Asst. U. S. Atty., Fargo, N. D., and Olin M. Stansbury, Jr., Wichita, Kan., for defendant.

## MEMORANDUM OF DECISION

RONALD N. DAVIES, District Judge.

This is an action brought by the Merchants National Bank and Trust Company of Fargo, a corporation, as Administrator and Personal Representative of the Estate of Eloise A. Newgard, deceased, against the United States of America, to recover damages by reason of the alleged negligent conduct of the defendant's agents and employees which resulted in the killing of Eloise A. Newgard by her husband, William Bry Newgard,[1] in Detroit Lakes, Minnesota, July 31, 1965. Jurisdiction is predicated upon Title 28, U.S.C.A. § 1346 et seq., commonly described as the Federal Tort Claims Act. The suit is brought on behalf of the three minor children of the decedent: Elizabeth, born September 16, 1955, Ann Marie, born April 13, 1958, and Robert William, born December 28, 1960.

Basically, the questions here presented are factual in nature, necessitating a somewhat detailed statement of the evidence developed upon trial.

Early in the morning of January 17, 1965, Dr. Mack V. Traynor, a Fargo physician, was called to the Newgard apartment in Fargo, North Dakota, by Newgard's wife, Eloise. She was frantic-voiced and said she needed help. The doctor, promptly responding to the call, found Newgard glassy-eyed and making senseless talk about horses, cattle "and God most of the time." Dr. Traynor felt Newgard was completely psychotic. Earlier that same morning Eloise had telephoned her pastor, Reverend Richard C. Faust, who knew both Newgard and his wife. He, too, came to the apartment. A daughter, Elizabeth, admitted him. Eloise asked for his help. From elsewhere in the apartment Newgard was shouting "get him out." Reverend Faust says that Newgard finally appeared, yelling that he was "the reincarnation of Jesus Christ." He was clad in boxer shorts and T-shirt. Newgard pulled his shorts down, exposed himself and said he was "going to repopulate the world." Newgard accused his wife of unfaithfulness and threatened to kill her. Reverend Faust also understood

---

1. He will be referred to hereafter as Newgard, as not to confuse his name with that of his father, William S. Newgard.

Newgard to say that the "God of Fire" would repopulate the world.

Both the Newgards had taught Sunday school in his church, but Reverend Faust had so many complaints about Newgard, he was forced to relieve him of his teaching assignment. Reverend Faust later in the morning of January 17, 1965, was able to get Newgard to St. Luke's Hospital in Fargo by literally marching him there through the streets.

Dr. Albert C. Kohlmeyer, a well qualified psychiatrist, saw Newgard the same day in the Neuropsychiatric Institute section of the hospital. He found him very agitated, "carrying on" about religious ideas and testified that Newgard thought "he was Christ or some representative of Christ." Because of his delusional ideas, the psychiatrist thought Newgard was psychotic and although he saw Newgard only a couple of days, it was his belief that Newgard's illness had been coming on for a long time. Dr. Kohlmeyer felt Newgard was a schizophrenic, chronic, with acute exacerbation, paranoid type.

On January 19, 1965, the Cass County, North Dakota, Mental Health Board after a hearing, ordered Newgard committed to the State Hospital at Jamestown, North Dakota. Later because he was a veteran, an amended order was issued by the board, making the commitment a dual one so that Newgard could eventually be transferred to the Veterans Administration Hospital at Fort Meade,[2] South Dakota. Effective March 23, 1965, Newgard was transferred to Meade where he was admitted to a ward and placed under the direct supervision of Dr. Leonard S. Linnell, a medical doctor and psychiatrist. This was Dr. Linnell's first position as a psychiatrist since completion of his residency in psychiatry at the University of Minnesota and the Veterans Administration Hospital in Minneapolis.

Dr. Linnell had access to the records of Newgard from the North Dakota State Hospital at Jamestown, which he says he studied, he had access to the mental health records and the commitment papers which he studied and, of course, at all times while Newgard was at Meade he had access to any of Newgard's files and records of whatever kind or nature.

For a number of weeks Newgard was treated with tranquilizers and saw a clinical psychologist, Dr. Jesse H. Craft, weekly, for psychotherapy and examinations. During the course of Newgard's treatment and care he was interviewed by Dr. Linnell about once a week. The psychiatrist also sent Newgard to Dr. Truman M. Cheney, a vocational psychologist, for testing and reporting his job aptitudes. Newgard was given various jobs around the hospital, a procedure followed by Meade in the treatment of hospital patients and which is followed in hospitals of a similar nature. On or about May 25, 1965, Newgard received a letter from his father according to Dr. Linnell, advising Newgard an uncle had died. Newgard got permission from Dr. Linnell to attend the funeral and for that purpose was given a pass for one week's leave of absence "to his parents' home in North Dakota." Dr. Linnell told Newgard to go to the funeral and to his parents' home and to return to the hospital and not to make any other visits. It is quite evident that Dr. Linnell did not know where or when the funeral was to be held or even the city in North Dakota in which Newgard's parents lived. Nor did he consult any other member of the staff at Meade prior to releasing Newgard to attend a funeral conducted at Leeds, North Dakota, which was already over long before Newgard reached Fargo by bus on the day thereof. Dr. Linnell did, however, have Mrs. Lois Powers, a social worker at Meade, telephone Eloise Newgard as the patient's guardian, that Newgard was to be released to attend his uncle's funeral.

2. All future references to the Veterans Administration Hospital at Fort Meade, South Dakota, are simply to "Meade".

Mrs. Newgard, frightened for her life, sought help from people in Fargo who eventually got in touch with County Judge Paul M. Paulsen, Chairman of the Cass County Mental Health Board, who had Newgard taken into custody at the bus station in Fargo. Here it is noteworthy that Dr. Linnell called Judge Paulsen by long distance telephone on the day Newgard was released, ostensibly to attend the funeral and visit his parents' home. Dr. Linnell told Judge Paulsen, referring to Newgard, "Nobody need to be afraid because this man is cured and he wouldn't hurt anybody." Judge Paulsen thereupon told Dr. Linnell that everyone who knew about Newgard, his condition and his commitment, felt Newgard was far from well mentally and that he was a dangerous man and should not have been released. Dr. Linnell told Judge Paulsen also that "there is nothing to worry about; this man I have told not to stop in Fargo" and "not to try to see his wife." The Cass County Mental Health Board met next day and directed the sheriff of Cass County to return Newgard to Meade. On May 27, 1965, Cass County deputies Dewey Eagle and Archie Vraa did so.

After Newgard's return to Meade the authorities there began thinking about getting Newgard work in the Meade area. Sometime early in July, 1965, Eloise Newgard learned that Dr. Linnell and the Meade authorities were about to discharge Newgard, and very much concerned for her safety, called Meade and talked to Dr. Curt L. Rosenbaum, Meade's Chief of Staff. Dr. Rosenbaum says she was upset and hung up on him. Dr. Rosenbaum himself never diagnosed Newgard, although he conceded there was no way it could be said Newgard's condition was in complete remission when he arrived at Meade. Dr. Harland T. Hermann, Chief of Psychiatry at Meade, evaluated Newgard's case thereafter. Unfortuately his written report was in some manner lost since it could not be found in the Meade records and

files, but Dr. Hermann remembers making it and Dr. Linnell remembers seeing it. Dr. Hermann advised Dr. Linnell not to discharge Newgard.[3]

Sometime before July 18, 1965, Dr. Truman M. Cheney, Counseling Psychologist at Meade, had made arrangements to put Newgard on leave at the ranch owned by Mr. and Mrs. Clarence A. Davis located some ten miles north of Belle Fourche, South Dakota. Dr. Cheney told Mr. Davis that Newgard had had "a mental disturbance, a nervous breakdown" and that Newgard wanted hard work to forget some of his troubles and for rehabilitation purposes. Mr. Davis had never before had a Meade patient working on his ranch.

On July 18, 1865, Newgard was released by Dr. Linnell on work leave to rancher Davis. When asked what instructions he had received from Dr. Cheney with respect to Newgard, Mr. Davis replied:

"None whatsoever that I can recall. I don't believe there was anything said about any way that he would conduct himself, that he thought that he was completely arrested from his troubles and just needed a chance to work and get better rehabilitated again. But there was no reservations made of what I should do with him or for him; or there was no given pattern where I should pay the money or who I should give the money to or whether he was free to come and go. I assumed from the way they talked that I was to pay him and he was to come and go as he pleased."

Dr. Cheney on the other hand testified he had told Mr. Davis that Newgard had an emotional problem, that he might be nervous, that Newgard was upset because his wife was suing him for divorce, and that he had instructed Mr. Davis to call Meade if Newgard gave indication of unusual behavior.

Dr. Cheney conceded, on cross-examination, that he had not told Mr. Davis

---

3. Dr. Linnell on June 30, 1965, had signed an outright discharge for Newgard, "MHB" (Maximum Hospital Benefit).

what constituted "unusual behavior." It is Dr. Cheney's testimony that Dr. Linnell told him that Newgard could work in the immediate Fort Meade area, but that he would have to be kept in South Dakota and "more or less" under hospital surveillance. Dr. Cheney did not tell Mr. Davis that Newgard was under any hospital surveillance, that he could not leave South Dakota, or even that he was a mental patient.

Dr. Linnell testified that he received reports from Dr. Cheney that Newgard was doing well in his work and adjusting on the Davis ranch. This testimony is flatly contradicted by Dr. Cheney himself who testified that his only contact with Mr. Davis after Newgard was first placed on the Davis ranch, was after Newgard had gone to Detroit Lakes and killed his wife.

The second weekend when Newgard left the Davis ranch for the last time, Mr. Davis believed he was "going back to Sturgis" and took Newgard, with another employee, into Sturgis and let them off at the hotel in Belle Fourche. At no time during Newgard's stay at the Davis ranch was Mr. Davis ever contacted by any representative of Meade. So far as Mr. Davis was concerned he had simply hired another farmhand, quite free to come and go as he chose. Newgard told Mr. Davis he was "bitter about the way he had been used" but Mr. Davis did not understand what Newgard meant, nor did the latter amplify his statement. Newgard did tell Mrs. Davis that he was bitter toward his wife "because she had served those divorce papers on him" and Mrs. Davis remembers telling a newsman after Eloise Newgard's death that Newgard had told her "he resented the fact that his wife had him committed." Newgard also told Mrs. Davis he had bought a car like his wife's, some carpeting and other things, none of which find any evidentiary support in this record.

Dr. Russell O. Saxvik, a psychiatrist, former North Dakota State Health Officer and former Superintendent of the North Dakota State Hospital at James-town, testified he was acquainted with the standards of practice in mental hospitals in this area. He thought Jamestown State Hospital and Meade standards were comparable. He testified further that the Davises should have been given specific instructions with respect to Newgard, which the Court finds were not given. He further testified that a mental hospital would want to know the whereabouts of a patient on leave and that Mr. and Mrs. Davis should have been told to notify Meade immediately, if Newgard left the ranch, and that Meade in turn should have alerted the committing health board, which in the instant case was Cass County, North Dakota. Not one of these things was done in Newgard's case, although clearly the standards of practice in the area required that they be done. Moreover, Dr. Rosenbaum, one of the Government's own expert witnesses, testified that when a man has gone from an area in which he was given leave of absence "the matter should have been pursued, no question about that at all."

It develops that on July 24, 1965, Newgard left the ranch for the weekend. He was to have returned Monday, July 26th, but Newgard went to his parents' home at Mayville, North Dakota. His wife Eloise had no idea he was in Mayville and was there herself only for a brief visit. Newgard wanted his wife to return with him to Fargo but she declined. Newgard then called Mr. Davis, advising him he would return to work on the ranch on Tuesday, which he did. On the night of Friday, July 31, 1965, Mr. Davis again took Newgard into Belle Fourche, having paid him his wages. Newgard got possession of a car and ultimately drove to his mother-in-law's home in Detroit Lakes, Minnesota, where on July 31, 1965, he first attempted to run Eloise Newgard down with the car and failing that, got out of the vehicle, shot and killed her.

The Government sought to make much of Eloise Newgard's meeting her husband in Mayville, Sunday, July 25, 1965, which was entirely circumstantial so far

as she was concerned as the record reflects, and to make much of Eloise's alleged failure to telephone Meade as to his whereabouts. It ought not to be forgotten that Eloise A. Newgard was a well trained and responsible registered nurse; that she had worked in a hospital for mental patients; that she knew Newgard was mentally ill and under the supervision of Meade; that she knew he was going back to the ranch and supposedly, at any rate, that Newgard was under the care and supervision of Meade personnel. Her conduct was that of any normally prudent person with any common sense. She wanted him away from her because of his mental illness and her deathly fear of him. She encouraged his going back to South Dakota; and he went back.

Similarly the Government made much of Eloise Newgard visiting her husband at Meade in mid June, 1965, when she journeyed down to South Dakota with her mother, Mrs. Danielson, and the three Newgard children. On that occasion Eloise Newgard talked to Mrs. Lois Powers, the social worker, and to Dr. Linnell. There was a good deal of testimony concerning Eloise's attitude and conduct at Meade, but one inference is clearly drawn from the credible evidence in this action, and that is that Dr. Linnell believed almost everything Newgard told him without investigating or causing to be investigated any of Newgard's statements. Dr. Linnell quite evidently preferred "exaggeration" to "delusional" in describing Newgard's statements and appeared convinced that Eloise Newgard needed psychiatric help herself.

The evidence supports the inference that had Dr. Linnell devoted more of his time and talents to Newgard and less of them attempting to diagnose Newgard's wife, conceivably she would never have met so tragic and untimely a death. This Court thinks it abundantly clear, from the record in this case, that Dr. Linnell knew that Eloise Newgard was afraid of her husband, and it is utterly incredible that she would not have mentioned it to Dr. Linnell or that he would

not have questioned her about it at their conference in Meade in June, 1965. Yet that is Dr. Linnell's testimony.

Because of the completely groundless statements by Newgard concerning his wife's fidelity and the nature of his statements to Reverend Faust, Deputy Sheriffs Eagle and Vraa on the same subject, and in the light of Dr. Linnell's seeming preoccupation with having Eloise Newgard seek psychiatric help herself, it seems singularly appropriate to point out some of the testimony received in this case concerning Eloise A. Newgard. Dr. William E. G. Lancaster, an able and experienced physician, a retired member of the Fargo Clinic, and for some 35 years a member of the Cass County Mental Health Board, who knew her well, said she was "as stable a nurse as we ever had." C. Warner Litten, Manager of the Fargo Clinic, who hired and supervised Mrs. Newgard, said "She was the finest nurse I ever employed." The evidence shows Eloise A. Newgard to have been a fine Christian woman, a splendid mother, and a faithful wife.

Dr. Linnell ignored and rejected every warning signal that Newgard was delusional at Meade and every warning signal that Eloise A. Newgard had every reason to be in mortal fear of her husband because of his prior conduct and the nature of some of the letters he wrote her while a patient at Meade. Dr. Linnell felt the recommittal order of the Cass County Mental Health Board of May 27, 1965, was "incorrect". Along with its recommittal order the Cass board sent to Meade Newgard's letter to his wife dated May 22, 1965. Dr. Linnell still referred to Newgard's cattle deals as "not a case of delusional thinking, it was exaggeration." Donald E. Frees, a social worker at the Veterans Administration Hospital in Fargo, made a thorough, comprehensive and very revealing report on the family history of the Newgards at the request of Meade. Dr. Linnell saw this instrument and conceded that he had no information that would provide him any basis for disregarding the information in Mr. Frees'

report. Yet it is clear from the evidence that Dr. Linnell ignored the report. Had he even heeded the warning implicit in the summary of the social worker, Mr. Frees, which suggested that Newgard had become quite astute at manipulating people, it might have given the doctor pause, but it did not. It is worth noting that Dr. Rosenbaum testified that psychiatrists could not rely upon what a patient tells them in a mental hospital and that is why they have social service reports. Dr. Rosenbaum was shown Mr. Frees' report and testified that it was better than average.

One of the Government witnesses testifying was Dr. Jesse H. Craft, a clinical psychologist on the Meade staff, who evaluated Newgard. Dr. Craft gave Newgard certain tests and submitted a written evaluation to Dr. Linnell as a diagnostic aid to the psychiatrist. His testing showed, among other things, clues of organic brain damage. Dr. George B. Kish, the Chief Clinical Psychologist at Meade, testified he did not agree with Dr. Craft that there was evidence of brain damage, even though Dr. Kish had not read all the reports on Newgard. Dr. Craft had been questioned under oath by Mr. Olin M. Stansbury, Jr., a Field Examiner for the Veterans Administration and one of the Government's attorneys in this trial. These questions and answers had been reduced to writing and sworn to before Mr. Stansbury on December 10, 1965. Paradoxically, when plaintiff's counsel demanded to see Dr. Craft's statement, which on its face was styled "deposition", the Government vigorously objected that it was the "work product" of Government lawyers. Dr. Linnell had been similarly questioned under oath twice, on December 9th and December 12th, 1965. But when plaintiff's attorney asked for copies of Dr. Linnell's sworn statements Government counsel promptly produced them without objection or without any reference to "work product".

We now examine the record to see whether it may be determined why the Government's position was so flexible with respect to Dr. Linnell's prior interrogation and so inflexible with respect to the questioning of Dr. Craft. Among the questions asked of Dr. Craft by Mr. Stansbury on December 10, 1965, under oath, were these:

"Q. Have you been informed of the facts on the commitment to the effect that he had choked his wife and had a loaded pistol in the home the day that his wife had asked for his commitment?

A. No, he didn't tell me anything about that.

Q. Did you ever have access to the VA Hospital Correspondence File in which a copy of that transcript is available?

A. No, I didn't.

Q. Had anyone ever told you about that?

A. Not that I recall.

Q. Now, in view of that fact, if in fact it were true, would you have taken his show of jealously (sic) after July 1st more seriously in your recommendations to the Team before they placed him out on leave of absence?

A. *I certainly would if there had been any indication that he had any serious intent toward the wife. I certainly would have recommended against his going.*

Q. Maybe I'm not making myself clear, Doctor, but what I have in mind is if you had all the information that you have had before July 18th with the exception of the fact that you would have been furnished the information from the commitment to the effect that he had tried to choke his wife on or about January 17th, 1965, would that one more piece of information made you hesitant in agreeing with the Team that he should be released on a leave of absence? Just the one fact that one time previously he had tried to choke

his wife or had threatened to and apparently had a loaded gun available in the home to do damage.

A. *I certainly wouldn't have recommended his release had I known that he had any such ideas or had behaved in that way.*

Q. Why?

A. *Because it would have. shown more evidence of his homicidal— rather it would have shown evidence of homicidal thinking which I was completely unaware of."* (Emphasis mine.)

There follows a series of questions by Mr. Stansbury and answers by Dr. Craft which clearly show that Mr. Stansbury sought to rehabilitate Dr. Craft's testimony, which was patently damaging to the Government's position. In the posture of this lawsuit that course of conduct with Dr. Craft, the Government's own witness, falls just short of being reprehensible.

The plaintiff alleges that the Government, acting through its duly authorized agents employed by the Veterans Administration, undertook the custody, care and treatment of Newgard, knowing him to be an insane and incompetent person with homicidal tendencies, and that the Government's inexcusable negligence was the proximate cause of Eloise A. Newgard's death on July 31, 1965, at the hands of her husband.

The plaintiff's burden in this type of case is not an easy one, but it has successfully borne it, in proving, by a preponderance of the relevant, material and credible evidence, that the negligence of the defendant acting by and through its duly authorized agents and employees was indeed the sole and proximate cause of the death of Eloise A. Newgard, and the damages sustained by the plaintiff as a result of her slaying.

The Government argued that modern psychiatry was on trial in this lawsuit. I reject that argument. It is not overstatement to suggest, however, that the *modi operandi* of some of its practitioners are. And that of some psychologists as well.

The Government contends by way of affirmative defense that the United States is exempt from liability under § 2680(a) of Title 28 U.S.C.A. which provides that § 1346(b) shall not apply to:

"(a) Any claim based upon an act or omission of an employee of the Government, exercising due care, in the execution of a statute or regulation, whether or not such statute or regulation be valid, or based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused."

It is the Government's position that the granting of the leave of absence to Newgard to work on the Davis ranch near Belle Fourche was the exercise of due care in the execution of a Veterans Administration regulation, and that this falls within the exception set out in § 2680.

█ Considering the circumstances under which Newgard was placed on leave of absence at the Davis ranch, as disclosed by the credible evidence, the Government's agents and employees not only did not exercise due care; in the view of this Court they exercised no care at all.

The test of liability under the Federal Tort Claims Act is set out in § 2674, the first paragraph of which reads:

"The United States shall be liable, respecting the provisions of this title relating to tort claims, in the same manner and to the same extent as a private individual under like circumstances, but shall not be liable for interest prior to judgment or for punitive damages."

The Fourth Circuit Court of Appeals pointed out in Somerset Seafood Co. v. United States, 193 F.2d 631, 634, that:

"* * * The Act must be given a liberal construction to ward off the obvious evil which the Act was passed to prevent—the cumbersome and unwieldy practice of seeking relief in

Congress by private bills. The jurisdiction granted to the federal District Courts by § 1346(b) of the Act is couched in quite broad and very expansive language. See, United States v. Aetna Casualty & Surety Co., 338 U.S. 366, 383, 70 S.Ct. 207, 94 L.Ed. 171; American Stevedores v. Porello, 330 U.S. 446, 453, 67 S.Ct. 847, 91 L. Ed. 1011; United States v. Travis, 4 Cir., 165 F.2d 546, 547."

Again, the Fourth Circuit in White v. United States, 317 F.2d 13, 17 (1963), speaking through Judge J. Spencer Bell, said:

"* * * While the policy embodied in the Veterans Administration Regulations that patients should be allowed the maximum of freedom warranted by their condition is a discretionary decision, the application of that policy to an individual case is not within the category of policy decisions exempted by the statute. The application of that policy to the individual case is an administrative decision at the operational level which if negligently done will make the Government liable—whether it involves substandard professional conduct (malpractice) or simple negligence in custodial care. * * *"

■ This Court is of the opinion that in the case of Newgard the defendant's agents were tortiously negligent both in the matter of substandard professional conduct on the part of Dr. Linnell, and because of gross negligence on the part of Dr. Linnell and Dr. Cheney in the careless custodial care of Newgard. Moreover, Dr. Craft was negligent in not bringing to the attention of the appropriate Meade personnel a letter from Newgard while the latter was on the Davis ranch, in which Newgard made reference to returning to North Dakota and selling some cattle. Newgard's cattle dealings [4] were just as delusional as his horse dealings. The Government did produce one John J. Froehlich, a farmer, who on January 9, 1965, made "a deal" with New-

gard for twelve head of quarter horses for $2400.00. Newgard got the horses and Mr. Froehlich got a bad check. Through the efforts of Eloise A. Newgard Mr. Froehlich got eleven of the twelve horses back. Somewhat crestfallen Mr. Froehlich concluded, after Newgard's check was returned, that Newgard really was not a horse dealer after all. Because of Newgard's well known delusional thinking, Dr. Craft was negligent in not seeing that the letter was at least placed in Newgard's file where presumably some Meade personnel, in due course, would have read it. Dr. Craft does not even know what happened to the letter.

■ Nor may it be said that Dr. Curt L. Rosenbaum, Meade's Chief of Staff, was not negligent. It was he who received the telephone call from Eloise A. Newgard. Routinely he put a note of the conversation in Newgard's file, but at no time did he direct anyone at Meade to pursue the matter of Eloise Newgard's phone call further to determine what caused her to be upset and allegedly to have hung up the phone on him. Dr. Rosenbaum, as the supervisor of all professional services at Meade, did discuss the matter with Dr. Harland T. Hermann, Meade's Chief of Psychiatry, and suggested Newgard should not be released because of his wife's feelings, but he did not, as he should have, follow through on the matter.

■ Dr. Hermann, a man with impressive credentials as a psychiatrist, conceded that Newgard's leave of absence was not a full discharge and that Newgard was to return to Meade for reevaluation. There is, of course, no question about whether Newgard was a patient under the control of Meade at the time of Eloise A. Newgard's murder. He was.

It is a fair and reasonable inference from the testimony and evidence in this case that the psychiatrists and psychologists at Meade believed Newgard's unsubstantiated and uninvestigated stories

4. Sometime during late 1964 or early 1965 Newgard told his pastor, Reverend Faust, he was giving $50,000.00 to the church "through some cattle deal."

about his business ventures and his statements about his wife and that no one placed any credence in the statements of Eloise A. Newgard, Dr. Lancaster, Judge Paulsen, Mr. Rutland, Dr. Kohlmeyer, or Dr. Hubert A. Carbonne.[5] Dr. Carbonne, the record shows, is a psychiatrist certified by the American Board of Psychiatry and Neurology in 1950 and is also a man with impressive qualifications.

It is also a fair and reasonable inference to be drawn from the evidence that Dr. Linnell felt there was something wrong with Eloise A. Newgard; that she was not interested in anything but keeping Newgard away from her; that she did not visit him often enough at Meade; and that her physical fear of Newgard was groundless. Dr. Linnell not only failed to use the facilities available to him to attempt to verify the things Newgard was telling him, and which Dr. Linnell mistakenly described as "exaggeration", but obviously completely ignored the contents of the social service report from Fargo which certainly should have alerted him to the fact that there was something seriously wrong with Newgard.

It is important to note that Dr. Carbonne testified that the purpose of a social worker's report is "to contribute as much information as can possibly be gathered to be presented for the purpose of understanding the patient's problems and *arriving at a diagnosis*." (Emphasis mine.)

■ The plaintiff is entitled to recover damages from the defendant, but before determining the amount thereof the Court addresses itself to the question of what law to apply upon a claim grounded in tort having multi-state contacts. The three children on whose behalf this suit was brought are domiciled in and residents of North Dakota. Eloise A. Newgard at the time of her death was domiciled in and a resident of North Dakota. The defendant's Facility at Meade is in South Dakota. Newgard killed his wife Eloise in Minnesota.

Citing Richards v. United States, 369 U.S. 1, 82 S.Ct. 585, 7 L.Ed.2d 492 (1962), the Government argues that the Court should apply South Dakota local law. The Government's position, in the alternative, is that South Dakota would choose the law of Minnesota, where the death occurred, in which event the maximum recovery for wrongful death would be $35,000.00 It will be noted that the Government does not argue that South Dakota local law, under which maximum recovery would be $30,000.00, is mandatory under the doctrine of *Richards*. A careful reading of *Richards* demonstrates why it does not thus argue. *Richards* is understood by this Court to mean that under the Federal Tort Claims Act the entire law of the state where the negligence or the omission occurred must be applied, rather than the local law of that state. From their briefs, counsel concede that the state of South Dakota has never adopted a conflicts of law rule for multistate torts. Nor has the state of North Dakota. This Court is thus called upon to determine what the South Dakota conflicts of law rule is, in the absence of any pronouncement upon that point by the Supreme Court of South Dakota.

■ This Court is of the opinion that the South Dakota Supreme Court would follow its sister states, Minnesota and Wisconsin, in adopting "the most significant relationship" or the "most significant contacts" rule, and upon that basis and for the further reason that the "contacts" rule is a modern and enlightened one, the law of the State of North Dakota will be applied to the facts in this case.

5. Dr. Carbonne, the Superintendent of the Jamestown Hospital, on February 2, 1965, signed the Diagnosis Impression of Newgard, reciting:
  "Schizophrenic reaction, catatonic type. Recommendation: Continued hospitalization. Patient should be evaluated for electro-convulsive therapy. Impairment: Severe."

See Balts v. Balts, 273 Minn. 419, 142 N.W.2d 66, 71, n. 8 (1966):

"Richards v. United States, 369 U.S. 1, 12, 82 S.Ct. 585, 592, 7 L.Ed.2d 492, 500, which cites with approval Schmidt v. Driscoll Hotel, Inc., 249 Minn. 376, 82 N.W.2d 365, as one of the cases which 'depart from the general conflicts rule in order to take into account the interests of the State having significant contact with the parties to the litigation.'"

One jurisdiction after another has embraced the "contacts" rule. Wilcox v. Wilcox, 26 Wis.2d 617, 133 N.W.2d 408 (1965); Melik v. Sarahson, 49 N.J. 226, 229 A.2d 625 (1967); Babcock v. Jackson, 12 N.Y.2d 473, 240 N.Y.S.2d 743, 191 N.E.2d 279 (1963). For a scholarly and succinct summarization of the trend away from what Judge Kenneth P. Grubb describes as "the inadequacy of the mechanical application of the *lex loci delecti*" see Watts v. Pioneer Corn Company, 342 F.2d 617 (7th Cir. 1965).

Newgard's having been a patient at Meade in South Dakota was simply happenstance so far as that state was concerned. Similarly, Eloise Newgard's having been physically in Minnesota when she was murdered was mere circumstance. She was there visiting relatives. Neither South Dakota nor Minnesota had or have the slightest interest in Eloise A. Newgard or her three children. The significant and very real relationships with all here involved were and are with the State of North Dakota, which very obviously has a vital interest in this litigation.

Eloise A. Newgard at the time of her death was a resident of North Dakota, earning her livelihood in Fargo, North Dakota, and supporting the three minor children in whose behalf this suit was brought, who resided with her in Fargo. The plaintiff corporation, a resident of North Dakota, is acting by virtue of appointment made by the Cass County, North Dakota, Court, in which Court Eloise A. Newgard's estate is being probated. At the time of Eloise A. Newgard's death, Newgard was under Meade's control and supervision by reason of a commitment of the Cass County Mental Health Board and remained thereunder until the killing, for which Newgard is currently in prison. Newgard was a North Dakota resident when duly committed to Jamestown and Meade and when the defendant's agents and employees assumed his care, custody and control at Meade. To the very end Eloise A. Newgard was the duly appointed guardian of Newgard by appointment of the Cass County, North Dakota, Court.

█ Finally, we turn to the amount of damages to be awarded plaintiff. In doing so this Court aligns itself with those courts which hold that the amount of recovery for death by wrongful act should not be diminished by the receipt of social security benefits. The amounts received or to be received by or on behalf of Elizabeth, Ann Marie, and Robert William Newgard are disregarded in reaching the monetary verdict in this case.

Initially it must be borne in mind that the Federal Tort Claims Act limits awards for damages in wrongful death actions to that which is compensatory in nature. 28 U.S.C.A. § 2674. In North Dakota there is no statutory limitation on the amount of recovery. Chapter 32–21–02, North Dakota Century Code. Punitive or exemplary damages are forbidden under the North Dakota statute.

█ The North Dakota Supreme Court has upon many occasions spoken upon the basis for recovery. In considering damages, pecuniary value of services which the beneficiaries might reasonably have expected may be taken into account. Stejskal v. Darrow, 55 N.D. 606, 215 N.W. 83, 53 A.L.R. 1096. Mortality tables are not binding on the trier of facts. Schultz v. Winston and Newell Co., 68 N.D. 674, 283 N.W. 69. The factors to be considered include the decedent's age, health, condition in life, habits of industry and sobriety, mental and physical ca-

pacity, disposition to frugality and customary earnings of the deceased and the use made of them. Umphrey v. Deery, 78 N.D. 211, 48 N.W.2d 897. Damages include the loss of any and all services which children would probably have received from their mother and are not limited to those for loss of money or income. Dahl v. North American Creameries, Inc., N.D., 61 N.W.2d 916. There is evidence in this case that Eloise A. Newgard, had she lived, would have received periodic pay raises. The North Dakota Supreme Court inferentially supports the admissibility of such evidence to show future earning power. Quam v. Wengert, N.D., 86 N.W.2d 741. Moreover, the expense of educating children was held to be relevant to money or services that could reasonably be expected from the decedent, in the same case.

It is difficult indeed to place a monetary value on the loving care and the advice and guidance of which the Newgard children will be forever deprived through the loss of their mother. It must be included, dispassionately, with the other factors set out herein in reaching the complex and always vexing question of compensatory loss in this type of case, and the declining value of the dollar has been taken into account.

The Court concludes that plaintiff is entitled to recover the sum of Two Hundred Thousand Dollars ($200,000.00) from the defendant, as compensatory damages, arising out of and from the gross negligence of the defendant, acting by and through its agents and employees, which was the sole and proximate cause of the death of Eloise A. Newgard, together with interest after entry of judgment, and costs as provided by law.

This Memorandum of Decision is considered in compliance with rule 52(a) Federal Rules of Civil Procedure, but plaintiff's counsel may, at their option, prepare formal findings of fact, conclusions of law, and order for judgment in conformance with this decision. They will in any event submit judgment herein through the Clerk of this Court.

It is so ordered.