Douglas Glynn **PAYTON**, Administrator of the estate of Sheryl Lynn Payton, deceased, et al., Plaintiffs–Appellants,

v.

The **UNITED STATES of America,** Defendant–Appellee.

No. 79–2052.

United States Court of Appeals, Fifth Circuit. Unit B

Feb. 2, 1981.

---

Edward L. Hardin, Jr., Leon Kelly, Jr., Birmingham, Ala., for plaintiffs–appellants.

Emilia M. DeMeo, Trial Atty., Eloise E. Davies, U. S. Dept. of Justice, Washington, D. C., for defendant–appellee.

Before JONES, FAY and HENDERSON, Circuit Judges.

FAY, Circuit Judge:

 It is alleged that a federal prisoner guilty of attacking or ravishing multiple females of all ages was released from custody in total disregard of extensive medical reports confirming him as a homicidal psychotic and that shortly thereafter he brutally beat, murdered and mutilated three females including appellants' decedent. Relief is sought by the victim's husband and children against both prison and parole officials. The trial court, 468 F.Supp. 651, dismissed for lack of jurisdiction. We reverse.

The question presented is whether the alleged conduct by personnel of the United States Board of Parole and the United States Bureau of Prisons comes within the provisions of the Federal Tort Claims Act, 28 U.S.C. §§ 1346(b) and 2671–2680 (1976) (FTCA) or is exempt as a "discretionary function" pursuant to 28 U.S.C. § 2680(a) (1976). We conclude that section 2680(a) is not applicable and that the allegations state a valid claim for relief under the FTCA.

I.

Appellants allege and we accept as true on a motion to dismiss, see Conley v. Gibson, 355 U.S. 41, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957); Menchaca v. Chrysler Credit Corp., 613 F.2d 507, 511 (5th Cir. 1980), that in

1977 Thomas Warren Whisenhant was convicted of the brutal murder and mutilation of Sheryl Lynn Payton, the appellants' decedent. This murder was not the first violent crime for Thomas Warren Whisenhant.

In 1966, as a member of the United States Air Force, Whisenhant was sentenced to twenty years in federal prison on a charge of assault with intent to murder arising out of the severe and brutal beating of a female member of the Air Force. Prompt medical attention saved the life of this initial victim. While serving his sentence Whisenhant manifested his continued homicidal tendencies by threatening the life of the only female with whom he came in contact, an employee of the federal penitentiary at which he was incarcerated. During this time period he was repeatedly diagnosed as psychotic and described as suffering from schizophrenia, paranoid type. His mental condition was noted as aggressive, chronic, severe, and manifested by brutality and assaultive behavior. Further, in 1968 one prison psychiatrist concluded that Whisenhant was in dire need of long term psychiatric treatment which he did not receive. Despite all of these warning signals, Whisenhant's sentence was reduced to ten years in 1970 and he was granted parole on November 28, 1973.[1]

Subsequent to parole Whisenhant brutally beat and murdered, on November 21, 1975, Ms. Patricia Hitt in Mobile, Alabama. On April 16, 1976, he kidnapped and murdered Mrs. Venora Hyatt also in Mobile, returning the next day to brutally mutilate the body.[2] Finally, on October 16, 1976 he kidnapped, raped and murdered appellants' wife/mother, returning to brutally mutilate her body in a manner similar to that of Mrs.

1. The complaint also alleges that Whisenhant's criminal records, available prior to parole, included a charge for assaulting a fourteen year old girl with intent to ravish in May, 1973 and his possible involvement in the murder of an elderly woman also in 1973. How these events occurred while Whisenhant was in federal custody is not clear.

2. The complaint alleges:
 On April 17, 1976, said Whisenhant returned to where he had left Mrs. Hyatt's body and

brutally mutilated said body as follows: there were nine (9) stab wounds just above the heart area; the abdomen was slashed open; the thighs were slashed through their entire length; the throat was cut, the larynx was severed; the vagina was cut by two (2) lateral incisions, each six (6) inches long; the labia was severed from the pubis; and both breasts were fully amputated.
Record, at 2.

Hyatt. Whisenhant confessed to all of these actions.

During Whisenhant's trial for the murder of appellants' decedent a psychiatrist who had examined Whisenhant's records testified that appellee's treatment of Whisenhant as a rational criminal rather than as a mental patient was contrary to elementary knowledge about psychotic behavior. Specifically, he testified that Whisenhant's behavior should have been recognized as non-specific and intrapsychic and therefore repetitive and that as a homicidal psychotic his release on parole was grievous error bordering on gross negligence.

Appellants filed the standard administrative forms with appellee claiming damages for the death of Mrs. Payton and in the absence of final disposition after six months, in accordance with 28 U.S.C. § 2675(a) (1966),[3] that claim was withdrawn and this action instituted. The complaint avers that the negligent reduction of Whisenhant's sentence by appellee, United States Parole Board, and the subsequent negligent decision to release and parole Whisenhant by the Board, due to the Board's failure to acquire and read the records indicating his murderous propensities or in disregard of these propensities, proxi-

mately caused Mrs. Payton's death and appellants' injuries. It alternatively avers that the Parole Board's negligence in failing to make adequate provisions for, or the negligent carrying out of, continued treatment and supervision of Whisenhant after parole was the proximate cause of appellants' injuries. Appellants also aver that appellee, United States Bureau of Prisons, negligently failed to have Whisenhant confined in a mental institution until restored to sanity or until his entire twenty year sentence was completed in accordance with 18 U.S.C. § 4241 (1976),[4] and further that prison authorities negligently provided improper psychiatric treatment for Whisenhant. Finally, the complaint avers that appellee, Bureau of Prisons, negligently failed to provide the United States Parole Board with all pertinent records prior to the time of Whisenhant's release and parole, which failure resulted in the improper parole decision.

## II.

By enacting the FTCA Congress authorized a limited waiver of sovereign immunity in tort actions. The statute confers jurisdiction upon the federal district courts with respect to

---

**3.** 28 U.S.C. § 2675(a) (1966) provides:

(a) An action shall not be instituted upon a claim against the United States for money damages for injury or loss of property or personal injury or death caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment, unless the claimant shall have first presented the claim to the appropriate Federal agency and his claim shall have been finally denied by the agency in writing and sent by certified or registered mail. The failure of an agency to make final disposition of a claim within six months after it is filed shall, at the option of the claimant any time thereafter, be deemed a final denial of the claim for purposes of this section. The provisions of this subsection shall not apply to such claims as may be asserted under the Federal Rules of Civil Procedure by third party complaint, cross–claim, or counterclaim.

**4.** 18 U.S.C. § 4241 (1970) provides:

A board of examiners for each Federal penal and correctional institution shall consist

of (1) a medical officer appointed by the warden or superintendent of the institution; (2) a medical officer appointed by the Attorney General; and (3) a competent expert in mental diseases appointed by the Surgeon General of the United States Public Health Service.

Such board shall examine any inmate of the institution alleged to be insane or of unsound mind or otherwise defective and report their findings and the facts on which they are based to the Attorney General.

The Attorney General, upon receiving such report, may direct the warden or superintendent or other official having custody of the prisoner to cause such prisoner to be removed to the United States hospital for defective delinquents or to any other institution authorized by law to receive insane persons charged with or convicted of offenses against the United States, there to be kept until, in the judgment of the superintendent of said hospital, the prisoner shall be restored to sanity or health or until the maximum sentence, without deduction for good time or commutation of sentence, shall have been served.

claims against the United States, for money damages ... for injury or loss of property, or personal injury or death caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment, under circumstances where the United States, if a private person, would be liable...

28 U.S.C. § 1346(b) (1976). Excluded from this broad grant of jurisdiction is

[A]ny claim based upon an act or omission of an employee of the Government exercising due care, in the execution of a statute or regulation, whether or not such statute or regulation be valid, or based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused.

28 U.S.C. § 2680(a) (1970). However, the Act does not provide a definition of "discretionary function." We must turn, therefore, to judicial interpretation and the FTCA's legislative history for its meaning and develop an appropriate analytical framework which is applicable not only to the facts of this action but to the broad spectrum of such governmental activities.

5. Negligence was also alleged regarding the Coast Guard's handling of the fire once it started. *Id.* at 42–43, 73 S.Ct. at 971.

6. One paragraph which appears time and time again in committee reports on the FTCA explains the proposed exemption:

"The first subsection of section 402 exempts from the bill claims based upon the performance or nonperformance of discretionary functions or duties on the part of a *Federal agency or Government employee*, whether or not the discretion involved be abused, and claims based upon the act or omission of a Government employee exercising due care in the execution of a statute or regulation, whether or not valid. This is a highly important exception, intended *to* preclude any possibility that the bill might be construed to authorize suit for damages against the Government growing out of an authorized activity, such as a flood–control or irrigation project, where no negligence on the part of any Government agent is shown, and the only ground for suit is the contention

The parties agree that the seminal decision construing the exception is *Dalehite v. United States*, 346 U.S. 15, 73 S.Ct. 956, 97 L.Ed. 1427 (1953). This action was brought under the FTCA for personal injuries and deaths resulting from the cataclysmic explosion in Texas City, Texas of nitrate fertilizers manufactured by the government in surplus ordnance plants for shipment to occupied Europe. The findings of causal negligence fell roughly into three categories—carelessness in drafting and adopting the fertilizer export plan, negligence in manufacturing the fertilizer and dereliction of duty in failing to police shipboard loading.[5] *Id.* at 24, 73 S.Ct. at 962. The Supreme Court rejected these claims holding that the government's actions were protected as discretionary functions. *Id.* at 42, 44, 73 S.Ct. at 971, 972.

After reviewing the legislative history, the *Dalehite* Court determined that § 2680(a) was drafted as a clarifying amendment to assure protection for the government against tort liability for administrative or regulatory policy errors while allowing relief for run–of–the–mill tortious conduct of government employees and agents.[6] *Id.* at 26–27, 28 n.19, 73 S.Ct. at 963, 964 n.19. Therefore, the majority concluded that

that the same conduct by a private individual would be tortious, or that the statute or regulation authorizing the project was invalid. It is also designed to preclude application of the bill to a claim against a regulatory agency, such as the Federal Trade Commission or the Securities and Exchange Commission, based upon an alleged abuse of discretionary authority by an officer or employee, whether or not negligence is alleged to have been involved. To take another example, claims based upon an allegedly negligent exercise by the Treasury Department of the blacklisting or freezing powers are also intended to be excepted. The bill is not intended to authorize a suit for damages to test the validity of or provide a remedy on account of such discretionary acts even though negligently performed and involving an abuse of discretion. Nor is it desirable or intended that the constitutionality of legislation, or the legality of a rule or regulation should be tested through the medium of a damage suit for tort. However, the common–law torts of employees of regulatory agencies would be included within

[t]he "discretion" protected by the section is not that of the judge–a power to decide within the limits of positive rules of law subject to judicial review. It is the discretion of the executive or the administrator to act according to one's judgment of the best course, a concept of substantial historical ancestry in American law.

*Id.* at 34, 73 S.Ct. at 967. In amplification the Court went on to state that:

It is unnecessary to define, apart from this case, precisely where discretion ends. It is enough to hold, as we do, that the "discretionary function or duty" that cannot form a basis for suit under the Tort Claims Act includes more than the initiation of programs and activities. It also includes determinations made by executives or administrators in establishing plans, specifications or schedules of operations. Where there is room for policy judgment and decision there is discretion. It necessarily follows that acts of subordinates in carrying out the operations of government in accordance with official directions cannot be actionable. If it were not so, the protection of § 2680(a) would fail at the time it would be needed, that is, when a subordinate performs or fails to perform a causal step, each action or nonaction being directed by the superior, exercising, perhaps abusing, discretion.

*Id.* at 35–36, 73 S.Ct. at 967–968.

While this language certainly permits an extremely broad interpretation of the application of the exemption, it has been limited by subsequent decisions which favor deeper

analysis. As so ably put by Judge Goldberg:

The description of a discretionary function in *Dalehite* permits the interpretation that any federal official vested with decision–making power is thereby invested with sufficient discretion for the government to withstand suit when those decisions go awry. Most conscious acts of any person whether he works for the government or not, involve choice. Unless government officials (at no matter what echelon) make their choices by flipping coins, their acts involve discretion in making decisions.

If the Tort Claims Act is to have the corpuscular vitality to cover anything more than automobile accidents in which government officials were driving, the federal courts must reject an absolutist interpretation of *Dalehite....*

*Smith v. United States,* 375 F.2d 243, 246 (5th Cir. 1967).

One of the first analytical approaches utilized by the Courts to ensure this corpuscular vitality was suggested in *Dalehite* as the "planning level–operational level" distinction. *Id.* at 42, 73 S.Ct. at 971. *See Indian Towing Co. v. United States,* 350 U.S. 61, 64, 76, 76 S.Ct. 122, 124, 130, 100 L.Ed. 48, 53, 59 (1955).[7] This approach obviously looked to the level at which the activity complained of took place as being indicative of the proper result. *See Fair v. United States,* 234 F.2d 288, 293 (5th Cir. 1956); *Cohen v. United States,* 252 F.Supp. 679, 687 (N.D.Ga. 1966), *rev'd on other grounds,* 389 F.2d 689 (5th Cir. 1967); *Fle-*

---

the scope of the bill to the same extent as torts of nonregulatory agencies. Thus, section 402(5) and (10), exempting claims arising from the administration of the Trading With the Enemy Act or the fiscal operations of the Treasury, are not intended to exclude such common–law torts as an automobile collision caused by the negligence of an employee of the Treasury Department or other Federal agency administering those functions."

H.R.Rep. No. 2245, 77th Cong., 2d Sess., p. 10; S.Rep. No. 1196, 77th Cong., 2d Sess., p. 7; H.R.Rep. No. 1287, 79th Cong., 1st Sess., pp. 5–6; Hearings before House Com. on Judiciary on H.R. 5373 and H.R. 6463, 77th Cong., 2d

Sess., p. 33. *See* 346 U.S. at 29–30 n.21, 73 S.Ct. at 964–65 n.21.

7. *Indian Towing* involved an action for negligence against the Coast Guard for the negligent operation and maintenance of a lighthouse. The government conceded, and the court concurred, that the activity was "operational." The court held that once the Coast Guard had exercised its discretion to operate a lighthouse at a certain place it was obligated to use due care to keep it in working order and to discover, repair or warn of malfunctions. 350 U.S. at 69, 76 S.Ct. at 126. It is significant that the dissent in *Dalehite* became the majority in *Indian Towing.*

*ishour v. United States*, 244 F.Supp. 762, 766 (N.D.Ill. 1965), *aff'd*, 365 F.2d 126 (7th Cir.), *cert. denied*, 385 U.S. 987, 87 S.Ct. 597, 17 L.Ed.2d 448 (1966).[8] Unfortunately such a standard is conclusionary and does not really aid the process. Rather,

> [i]t may be a makeweight in easy cases where of course it is not needed, but in difficult cases it proves to be another example of a distinction "so finespun and capricious as to be almost incapable of being held in the mind for adequate formulation." Mr. Justice Frankfurter for the Court in *Indian Towing, supra,* 350 U.S. at 68, 76 S.Ct. at 126, 100 L.Ed. at 55. Such nonstatutory "aids" to construction tend to obscure, to limit, or even to replace the standards whose meaning they are supposed to clarify. [citations omitted] It must be remembered that the question at hand here is the nature and quality of the discretion involved in the acts complained of.

*Smith v. United States,* 375 F.2d at 246. On the strength of this conclusion, we must look deeper into the purposes expressed by the FTCA to extract the sense of the matter and upon this attempt to build a workable standard.

In developing a practical analytical framework for determining the nature and quality of the discretion involved, certain broad principles must be kept in mind. We have been instructed to construe the FTCA liberally in order to implement its broad purpose and to avoid restricting the consent to be sued by expansive construction of exceptions. *See, e. g., Indian Towing Co. v. United States,* 350 U.S. 61, 64–65, 76 S.Ct. 122, 124, 100 L.Ed. 48, 48 (1955); *United States v. Yellow Cab Co.,* 340 U.S. 543, 550, 71 S.Ct. 399, 404, 95 L.Ed. 523, 530 (1951);

*United States v. Aetna Casualty & Surety Co.,* 338 U.S. 366, 383, 70 S.Ct. 207, 216, 94 L.Ed. 171 (1949). *See also Winston v. United States,* 305 F.2d 253, 270 (2d Cir. 1962) (en banc). We have also been admonished that the newness of the area should not operate as an obstacle to the imposition of liability for "the very purpose of the Tort Claims Act was to waive the government's traditional all–encompassing immunity from tort actions and to establish novel and unprecedented governmental liability." *Rayonier, Inc. v. United States,* 352 U.S. 315, 319, 77 S.Ct. 374, 377, 1 L.Ed.2d 354, 358 (1957). With these instructions in mind we turn to an overview of the particulars of the parole process.

### III.

Under the statutes in effect in 1973, the Board of Parole was an organ of the Department of Justice consisting of eight members appointed by the President with the advice and consent of the Senate.[9] 18 U.S.C. § 4201 (1970). Certain basic statutory terms and conditions were placed on the Board's decisionmaking and on a prisoner's eligibility for parole. Specifically, 18 U.S.C. § 4202 (1970) provided that:

> A Federal prisoner, other than a juvenile delinquent or a committed youth offender, wherever confined and serving a definite term or terms of over one hundred and eighty days, whose record shows that he has observed the rules of the institution in which he is confined, may be released on parole after serving one–third of such term or terms or after serving fifteen years of a life sentence or a sentence of over forty–five years.

Further, 18 U.S.C. § 4203(a) (1970) provided that:

> If it appears to the Board of Parole from a report by the proper institutional

---

8. The *Cohen* and *Fleishour* courts allowed the initiation of a suit by prisoners against prison officials for negligence in protecting plaintiffs from assault and injury by others prisoners. *Fair* involved an action to recover for the death of three persons shot by a homicidal, apparently mentally disturbed, Air Force officer after being negligently released from an Air Force Hospital.

9. In 1976 the Board became an independent agency with nine members designated the United States Parole Commission. Parole Commission and Reorganization Act, Pub.L. No. 94–233, § 2, 90 Stat. 219 (1976) *codified at* 18 U.S.C. § 4202 (1976).

officers or upon application by a prisoner eligible for release on parole, that there is a reasonable probability that such prisoner will live and remain at liberty without violating the laws, and if in the opinion of the Board such release is not incompatible with the welfare of society, the Board may in its discretion authorize the release of such prisoner on parole.

Such parolee shall be allowed in the discretion of the Board, to return to his home, or to go elsewhere, upon such terms and conditions, including personal reports from such paroled person, as the Board shall prescribe, and to remain, while on parole, in the legal custody and under the control of the Attorney General, until the expiration of the maximum term or terms for which he was sentenced. . . .

In essence, parole decisionmaking under these statutes was bounded by a threshold of eligibility based on time served and a duty to protect the welfare of society, in the process of determining the moment when a prisoner had become rehabilitated and thus, likely to live at liberty without violating the laws.

The Board, prior to 1973, exercised its powers in a largely unstructured manner. All release decisions were made by members of the Board after hearings with the inmate and the institutional case worker. Project, *Parole Release Decisionmaking And The Sentencing Process*, 84 Yale L.J. 810, 820 (1975). The hearing stage had been traditionally used by decisionmakers to observe the inmate in order to detect signs of rehabilitation. Parole decisions were made without reference to formal criteria and policies but purely upon the judgment of the Board member making psychological diagnosis and prognosis. *Id.* As a result, the Courts were loathe to review such decisions, especially on constitutional grounds,[10] in the event of parole denial. *See, e. g., Scarpa v. U.S. Board of Parole*, 477 F.2d 278, 280–82 (5th Cir.) *vacated for consideration of mootness*, 414 U.S. 809, 94 S.Ct. 79, 38 L.Ed.2d 44, *dismissed as moot*, 501 F.2d 992 (5th Cir. 1973); *Tarlton v. Clark*, 441 F.2d 384, 385–86 (5th Cir. 1971). However, judicial and scholastic criticism of this system grew due mainly to the large volume of release hearings and the lack of due process, or even explanation, accorded the inmate by the system.[11]

In order to rectify this situation, the Board of Parole, in 1973, established specific "guidelines for decision–making" consisting of two basic indices on which inmates are scored in all parole determinations.[12] These indices, the "offense severity" rating and "salient factor score", form the axis of a matrix. At the intersection of each factor/severity category on the matrix is listed a range of months representing the amount of time an inmate having these characteristics and offense rating could expect to be incarcerated prior to parole.[13] The offense severity scale was derived by averaging, on a one to six scale, evaluations by Board members and examiners of the seriousness of typical offenses commonly seen by the Board. As such the scale constitutes the Board's own subjective evaluation of the criminal behavior independent of the legal definition or sentence length.[14] The salient

---

**10.** The context of a constitutional or section 1983 challenge to the Board's decisions even under the present system, is completely different from that presented under the FTCA. *See Shahid v. Crawford*, 599 F.2d 666, 668–70 (5th Cir. 1979); *Brown v. Lundgren*, 528 F.2d 1050, 1055 (5th Cir.), *cert. denied*, 429 U.S. 917, 97 S.Ct. 308, 50 L.Ed.2d 283 (1976); *Pate v. Ala. Bd. of Pardons and Paroles*, 409 F.Supp. 478 (M.D. Ala.) *aff'd* 548 F.2d 354 (5th Cir. 1976).

**11.** *See, e. g.*, Project, *Parole Release Decisionmaking and the Sentencing Process*, 84 *Yale L.J.* 810, 821, n.48 (1975); Dawson, *The Decision to Grant or Deny Parole: A Study of Parole Criteria In Law and Practice*, 1966 *Wash.U.L.Q.* 243, 244.

**12.** *See* 28 C.F.R. § 2.20 (1979).

**13.** The format was adopted nationwide after a pilot project. *See* 38 Fed.Reg. 26652–57 (Sept. 24, 1973); 38 Fed.Reg. 31942–45 (Nov. 19, 1973). They are currently found, with only minor revision, at 28 C.F.R. §§ 2.1–2.59 (1979).

**14.** Alschuler, *Sentencing Reform and Parole Release Guidelines*, 51 *U.Colo.L.Rev.* 237, 237–

38, 241 (1980); Project, *supra*, note 11, at 823–24.

The following examples are listed in 28 C.F.R. § 2.20:

### Low

Alcohol or cigarette law violations, including tax evasion (amount of tax evaded less than $2,000) [1].

Gambling law violations (no managerial or proprietary interest) _____

Illicit drugs, simple possession _____

Marihuana/hashish, possession with intent to distribute/sale [very small scale (e. g., less than 10 lbs. of marihuana/less than 1 lb. of hashish/less than .01 liter of hash oil)].

Property offenses (theft, income tax evasion, or simple possession of stolen property) less than $2,000.

### Low Moderate

Counterfeit currency or other medium of exchange [(passing/possession) less than $2,000].

Drugs (other than specifically categorized), possession with intent to distribute/sale [very small scale (e. g., less than 200 doses)].

Marihuana/hashish, possession with intent to distribute/sale [small scale (e. g., 10–49 lbs. of marihuana/1–4.9 lbs. hashish/.01–.04 liters of hash oil)].

Cocaine, possession with intent to distribute/sale [very small scale (e. g., less than 1 gram of 100% purity, or equivalent amount)].

Gambling law violations—managerial or proprietary interest in small scale operation [e. g., Sports books (estimated daily gross less than $5,000); Horse books (estimated daily gross less than $1,500); Numbers bankers (estimated daily gross less than $750)].

Immigration law violations _____

Property offenses (forgery/fraud/theft from mail/embezzlement/interstate transportation of stolen or forged securities/receiving stolen property with intent to resell) less than $2,000.

### Moderate

Automobile theft (3 cars or less involved and total value does not exceed $19,999) [2].

Counterfeit currency or other medium of exchange [(passing/possession) $2,000–$19,999].

Drugs (other than specifically categorized), possession with intent to distribute/sale [small scale (e. g., 200–999 doses)].

Marihuana/hashish, possession with intent to distribute/sale [medium scale (e. g., 50–199 lbs. of marihuana/5–19.9 lbs. of hashish/.05–.19 liters of hash oil)].

Cocaine, possession with intent to distribute/sale [small scale (e. g., 1.0–4.9 grams of 100% purity, or equivalent amount)].

Opiates, possession with intent to distribute/sale [evidence of opiate addiction and very small scale (e. g., less than 1.0 grams of 100% pure heroin, or equivalent amount)].

Firearms Act, possession/purchase/sale (single weapon, not sawed-off shotgun or machine gun).

Gambling law violations—managerial or proprietary interest in medium scale operation [e. g., Sports books (estimated daily gross $5,000–$15,000); Horse books (estimated daily gross $1,500–$4,000); Numbers bankers (estimated daily gross $750–$2,000)].

Property offenses (theft/forgery/fraud/embezzlement/interstate transportation of stolen or forged securities/income tax evasion/receiving stolen property) $2,000–$19,999.

Smuggling/transporting of alien(s) _____

### High

Carnal knowledge [3] _____

Counterfeit currency or other medium of exchange [(passing/possession) $20,000–$100,000].

Counterfeiting [manufacturing (amount of counterfeit currency or other medium of exchange involved not exceeding $100,000)].

Drugs (other than specifically listed), possession with intent to distribute/sale [medium scale (e. g., 1,000–19,999 doses)].

Marihuana/hashish, possession with intent to distribute/sale [large scale (e. g., 200–1,999 lbs. of marihuana/20–199 lbs. of hashish/.20–1.99 liters of hash oil)].

Cocaine, possession with intent to distribute/sale [medium scale (e. g., 5–99 grams of 100% purity, or equivalent amount)].

Opiates, possession with intent to distribute/sale [small scale (e. g., less than 5 grams of 100% pure heroin, or equivalent amount) except as described in moderate].

Firearms Act, possession/purchase/sale (sawed-off shotgun(s), machine gun(s), or multiple weapons).

Gambling law violations—managerial or proprietary interest in large scale operation [e. g., Sports books (estimated daily gross more than $15,000); Horse books (estimated daily gross more than $4,000); Numbers bankers (estimated daily gross more than $2,000)].

Involuntary manslaughter (e. g., negligent homicide) _____

Mann Act (no force—commercial purposes) _____

Property offenses (theft/forgery/fraud/embezzlement/interstate transportation of stolen or forged securities/income tax evasion/receiving stolen property) $20,000–$100,000.

Threatening communications (e. g., mail/phone)—not for purposes of extortion and no other overt act.

### Very High

Robbery—(1 or 2 instances) _____

Breaking and entering—armory with intent to steal weapons _____

Breaking and entering/burglary—residence; or breaking and entering of other premises with hostile confrontation with victim.

factor score is an actuarial device used to predict the risk of repeat behavior based upon nine statistically determined personal characteristics relevant to such predictions.[15] The salient factor scale is based on criteria, in main, available at the time of

Counterfeit currency or other medium of exchange [(passing/possession)—more than $100,000 but not exceeding $500,000].

Drugs (other than specifically listed), possession with intent to distribute/sale [large scale (e. g., 20,000 or more doses) except as described in Greatest I].

Marihuana/hashish, possession with intent to distribute/sale [very large scale (e. g., 2,000 lbs. or more of marihuana/200 lbs. or more of hashish/2 liters or more of hash oil)].

Cocaine, possession with intent to distribute/sale [large scale (e. g., 100 grams or more of 100% purity, or equivalent amount) except as described in Greatest I].

Opiates, possession with intent to distribute/sale [medium scale or more (e. g., 5 grams or more of 100% pure heroin, or equivalent amount) except as described in Greatest I].

Extortion [threat of physical harm (to person or property)] _____

Explosives, possession/transportation _____

Property offenses (theft/forgery/fraud/embezzlement/interstate transportation of stolen or forged securities/income tax evasion/receiving stolen property) more than $100,000 but not exceeding $500,000.

Greatest I

Aggravated felony (e. g., robbery: weapon fired or injury of a type normally requiring medical attention).

Arson or explosive detonation [involving potential risk of physical injury to person(s) (e. g., premises occupied or likely to be occupied)—no serious injury occurred].

Drugs (other then specifically listed), possession with intent to distribute/sale [managerial or proprietary interest and very large scale (e. g., offense involving more than 200,000 doses)].

Cocaine, possession with intent to distribute/sale [managerial or proprietary interest and very large scale (e. g., offense involving more than 1 kilogram of 100% purity, or equivalent amount)].

Opiates, possession with intent to distribute/sale [managerial or proprietary interest and very large scale (e. g., offense involving more than 50 grams of 100% pure heroin, or equivalent amount)].

Kidnaping [other than listed in Greatest II; limited duration; and no harm to victim (e. g., kidnaping the driver of a truck during a hijacking, driving him to a secluded location, and releasing victim unharmed)].

Robbery (3 or 4 instances) _____

Sex act—force [e. g., forcible rape or Mann Act (force)] _____

Voluntary manslaughter (unlawful killing of a human being without malice; sudden quarrel or heat of passion).

Greatest II

Murder: _____

Aggravated felony—serious injury (e. g., robbery: injury involving substantial risk of death, or protracted disability, or disfigurement) or extreme cruelty/brutality toward victim.

Aircraft hijacking _____

Espionage_____

Kidnaping (for ransom or terrorism; as hostage; or harm to victim) _____

Treason _____

15. Hoffman & Adelberg, *The Salient Factor Score: A Nontechnical Overview*, 44 Fed.Prob., 44, 44 (Mar. 1980); Project, *supra*, note 11, at 824–25. The items considered in computing the score, a group characterization, are also contained in 28 C.F.R. § 2.20:

SALIENT FACTOR SCORE

Register Number _____

Name _____

Item A _____ □
No prior convictions (adult or juvenile) = 3
One prior conviction = 2
Two or three prior convictions = 1
Four or more prior convictions = 0

Item B _____ □
No prior commitments (adult or juvenile) = 2
One or two prior commitments = 1
Three or more prior commitments = 0

Item C _____ □
Age at behavior leading to first commitment (adult or juvenile):
26 or older = 2
18–25 = 1
17 or younger = 0

Item D _____ □
Commitment offense did not involve auto theft or check(s) (forgery/larceny) = 1
Commitment offense involved auto theft [X], or check(s) [Y], or both [Z] = 0

Item E _____ □
Never had parole revoked or been committed for a new offense *while on parole, and not a* probation violator this time = 1
Has had parole revoked or been committed for a new offense while on parole [X], or is a probation violator this time [Y], or both [Z] = 0

Item F _____ □
No history of heroin or opiate dependence = 1
Otherwise = 0

Item G _____ □
Verified employment (or full-time school attendance) for a total of at least 6 months during the last 2 years in the community = 1
Otherwise = 0

Total Score _____ □

sentencing and remains generally constant during the entire period of confinement. Neither index measures the inmate's rehabilitation, progress or adjustment in order to determine the time for his release.[16] Further, the time ranges utilized in the matrix represent a historic average of time actually served before parole by inmates with these factor/severity characteristics which were adopted by the Board as the basis for future parole determination.[17]

This new procedure represents an abandonment of the original concept of parole release justified upon its rehabilitative effect and based upon expert evaluation determining the proper moment of release under the statutory mandates.[18] The only element of the original concept retained in the regulations is found in the provisions of Section 2.20(c) for decisions outside the guidelines in certain instances.[19] However, these deviations must be supported in writing and appear to be very much the exception.[20] The information considered by the hearing examiners in making their determi-

nations includes reports from institutional staffs, prior criminal and parole record, presentencing investigations, sentencing recommendations and reports of physical, mental or psychiatric examinations. 28 C.F.R. § 2.19 (1973). From these records the salient factor score and offense severity rating are determined as well as any justification for a recommendation outside the guidelines. Hearing interviews appear to operate to confirm the records, to amplify ambiguities and to communicate the examiners' decisions.[21]

The present system has been said to "structure discretion" and to reflect a change in the system's goals away from individualization toward equality of treatment under generalized rules.[22] This appears to be a valid characterization. As a result of this standardization the process certainly takes on a fixed and mechanical flavor, with the rendering of determinations made in a somewhat ministerial manner and at a lower administrative level than previously.[23] Yet this characterization is

---

NOTE: For purposes of the Salient Factor Score, an instance of criminal behavior resulting in a judicial determination of guilt or an admission of guilt before a judicial body shall be treated as if a conviction, even if a conviction is not formally entered.

A score of 11–9 is "very good", 8–6 is "good", 5–4 is "fair" and 3–0 is "poor". The four categories for which time range guidelines are provided. *Id.*

16. Alschuler, *supra* note 14, at 238–39; Project, *supra* note 11, at 825.

17. Project, *supra* note 11, at 825. The ranges were developed originally by researchers based on a median derived from a sample group released between August 1970 and June 1972. Adjustments have been made by Board members based on statistical feedback or their own judgments. *Id.* at n.74. The guideline table was developed through research by the National Council on Crime and Delinquency. *Id.* at n.60.

18. Alschuler, *supra* note 14, at 238. The author questions whether the guidelines remove the reason for the Parole Board's existence. Indeed, members of the Board have stated that determining the appropriate moment of release is beyond them. *Id. See* Project, *supra* note 11, at 826, n.81 & 82, 828.

19. 28 C.F.R. § 2.20(c) (1979) suggests that violations of assaultive behavior or acts of repeated parole failures may warrant a decision outside the guidelines. Other examples appear to have been suggested but are no longer included in the regulations. *See* Project, *supra* note 11, at 825 and n.78, 826 and n.79.

20. Between October 1973 and March 1974, the period during which Whisenhant was released, 91.4% of initial parole hearing decisions were within the guidelines. 4.5% were above, 3.8% were below. Project, *supra* note 11, at n.75. *See also Brown v. Lundgren*, 528 F.2d 1050, 1055 (5th Cir.), *cert. denied*, 429 U.S. 917, 97 S.Ct. 308, 50 L.Ed.2d 283 (1976).

21. *See* Project, *supra* note 11, at 829–30, 831–833, n.103 & 104, 833–34, n.107 & 109.

22. Hoffman & Degostin, *Parole Decisionmaking: Structuring Discretion*, 38 *Fed.Prob.* 7 (Dec. 1974); Hoffman & Adelberg, *supra* note 15, at 44.

23. Commentators have indicated that two types of decisions are made in the parole process: parole policy decisions set by the Board members and individual case decisions delegated to hearing examiners. This division of labor leaves the Board members free to focus on policy making adjustments, monitoring and appeals. Hoffman & Degostin, *supra* note 22, at 7–11.

merely the starting point for our analysis, not the denouement.[24]

## IV.

The crux of the concept embodied in the discretionary function exemption is that of the separation of powers.[25] Satellite principles, which are perhaps only manifestations of the concept in practical terms, are the ability of the judiciary to adjudicate the claims made [26] and the ability of the administrators to govern by aggressive and effective decisionmaking.[27] Balancing these concerns is clearly the thrust of previous efforts to formulate a standard by reference to "planning–operational" or "discretionary–ministerial" distinctions.[28]

As ably put by Judge McGowan, such tests are

> more concerned with trying to distinguish between the functions performed within an area of readily recognizable governmental responsibility, than with undertaking to define precisely where the boundaries of that area lie. And, with such functions so identified and differentiated, it next inquires whether an injury inflicted as a consequence of one of such functions can be subjected to judicial redress without thereby jeopardizing the quality and efficiency of government itself. "Ministerial" connotes the execu-

tion of policy as distinct from its formulation. This in turn suggests differences in the degree of discretion and judgment involved in the particular governmental act. Where those elements are important, it is desirable that they operate freely and without the inhibiting influence of potential legal liability asserted with the advantage of hindsight.

*Elgin v. District of Columbia,* 337 F.2d 152, 154–55 (D.C. Cir. 1964).

It would certainly be valuable to articulate relevant criteria to be weighed by the trial courts in the context of the circumstances of each case which would account for and protect each policy consideration raised by the existence of this exemption in a statute designed to ease the burden of governmental injury on citizens. *See White v. United States,* 317 F.2d 13, 16 (4th Cir. 1963). *See also Evangelical United Brethren Church v. State,* 67 Wash.2d 246, 255, 407 P.2d 440, 445 (1965); *Bellavance v. State,* 390 So.2d 422 (Fla. 1st D.C.A.1980). Therefore, we will attempt to delineate some of the factors relevant to our inquiry without proposing a precise litmus paper test. *See Hendry v. United States,* 418 F.2d 774, 782 (2d Cir. 1969). The approach we take is based upon a pragmatic interest analysis which seeks a delicate balance between activism [29] and restraint, without the

---

24. *Cf. White v. United States,* 317 F.2d 13, 16 (4th Cir. 1963). (each case must be measured against the broad spectrum of government activity).

25. *See* James, *The Federal Tort Claims Act and the "Discretionary Function" Exception: The Sluggish Retreat of an Ancient Immunity,* 10 U.Fla.L.Rev. 184, 184 (1957); Note, *Separation of Powers and the Discretionary Function Exception: Political Question in Tort Litigation Against the Government,* 56 *Iowa* L.Rev. 930, 946 (1971).

 There is evidence in the legislative history to support this. When the present language was substituted for an earlier laundry list provision exempting specified activities from the FTCA, an Assistant Attorney General explained the change by observing that:
 ... the cases embraced within [the new] subsection would have been exempted from [the prior] bill by judicial construction. It is not probable that the courts would extend a Tort Claims Act into the realm of the validity

of legislation or discretionary administrative action, but H.R. 6463 makes this specific. *Hearings on H.R. 5373 and 6463 before the House Committee on the Judiciary,* 77th Cong. 2d Sess. 29 (1942) (statement of Francis M. Shea). *See Blessing v. United States,* 447 F.Supp. 1160, 1171 (E.D. Pa. 1978).

26. *See* James, *supra* note 25 at 184. The basic problem is that obviously tort law "furnishes an inadequate crucible for testing the merits of social, political, or economic decisions." 447 F.Supp. at 1170.

27. *See United States v. Muniz,* 374 U.S. 150, 163, 83 S.Ct. 1850, 1858, 10 L.Ed.2d 805, 815 (1963). Note, *supra* note 25, at 942–43, 950–51.

28. *See Dalehite v. United States,* 346 U.S. 15, 35–36, 42, 73 S.Ct. 956, 967–968, 971, 97 L.Ed. 1427 (1953); Note, *supra* note 25, at 950, n.105.

29. *See generally,* Johnson, *In Defense of Judicial Activism,* 28 Emory L.J. 901 (1979).

144

conclusory application of labels.[30] The most apt analogy is found, at least in regard to weighing institutional factors, in the Supreme Court's approach to the issue of political questions as set out in *Baker v. Carr*, 369 U.S. 186, 217, 82 S.Ct. 691, 710, 7 L.Ed.2d 663 (1962).[31] To this analysis must be added the consideration of the interests of the injured party since the spread of monetary losses among the taxpayers is the principle concern of the FTCA. *See Indian Towing Co. v. United States*, 350 U.S. 61, 64–65, 76 S.Ct. 122, 124, 100 L.Ed. 48 (1955); *Downs v. United States*, 522 F.2d 990, 998 (6th Cir. 1975); *Smith v. United States*, 375 F.2d 243, 248 (5th Cir. 1967).[32]

■ Considering initially the injured party, the court should review the nature of the loss imposed by the governmental injury. The more serious, in terms of physical or mental impairment, and isolated the loss the closer the question becomes as to whether the individual can be expected to absorb the loss as incident to an acceptable social or political risk of governmental activities.[33] Other factors to be weighed are the expectation of the public or the injured party and the nature of the reliance, whether based upon a consistent level of governmental activity or upon the party's lack of foresight. However, deep analysis of these considerations would be more significant in the negligence phase of the court's determi-

nations. A further point of consideration might be the existence of alternative remedies or compensations for the injured party,[34] since the dearth of such alternatives was a primary reason for the enactment of the FTCA.[35]

Looking to the government's interest, the trial court would need to assess the nature and quality of the governmental activity causing the injury. *Smith v. United States*, 375 F.2d 243, 246 (5th Cir. 1967). This could be done by examining the agency's guidelines, or procedures in the area, *see, e. g., Griffin v. United States*, 500 F.2d 1059, 1064–68 (3d Cir. 1974), and determining the administrative level at which the injurious activity took place. *See, e. g., Hendry v. United States*, 418 F.2d 774, 783 (2d Cir. 1969). Along these lines, the Court must determine if the allegations attack the rules formulated by the agency or merely their application. *Dalehite v. United States*, 346 U.S. at 27, 35, 73 S.Ct. at 967, 968, 97 L.Ed. at 1436, 1440; *Hendry v. United States*, 418 F.2d at 782. Certain of the *Baker* considerations become relevant at this juncture: whether this activity is one traditionally or constitutionally exercised by a coordinate branch of government or one fraught with political or policy overtones such as the feasibility or practicality of a program, *Dalehite v. United States*, 346 U.S. at 34, 73 S.Ct. at 967, or prosecutorial discretion,

---

30. *W. Prosser, Handbook On The Law Of Torts*, § 132, at 988–91 (4th Ed. 1971); Note, *supra* note 25, at 952, n.105; 447 F.Supp. at 1168.

31. The Court cited certain prominent formulations, the inextricable existence of such would result in dismissal. They are:
a textually demonstrable constitutional commitment of the issue to a coordinate political department; or a lack of judicially discoverable and manageable standards for resolving it; or the impossibility of deciding without an initial policy determination of a kind clearly for nonjudicial discretion; or the impossibility of a court's undertaking independent resolution without expressing lack of the respect due coordinate branches of government; or an unusual need for unquestioning adherence to a political decision already made; or the potentiality of embarrassment from multifar-

ious pronouncements by various departments on one question.
369 U.S. at 217, 82 S.Ct. at 710.

32. *See* Note, *supra* note 25 at 976–78.

33. *Id.* at 977. *See Downs v. United States*, 522 F.2d 990, 998, 1003 (6th Cir. 1975) (need to compensate for injuries balanced against effect on law enforcement activities and reasonableness of FBI's attack on hijacked plane).

34. *See Bellavance v. State*, 390 So.2d at 423–24.

35. *See* H.R.Rep.No.2800, 71st Cong., 3d Sess., p. 2–3; H.R.Rep.No.2428, 76th Cong., 3d Sess., p. 2; H.R.Rep.No.2245, 77th Cong., 2d Sess., p. 5–7; H.R.Rep.No.1287, 79th Cong., 1st Sess., p. 1–2; S.Rep.No.1400, 79th Cong., 2d Sess., p. 29–31.

*Smith v. United States*, 375 F.2d at 248, and whether this injurious activity is in an area of potential governmental embarrassment such as foreign affairs.[36] *Id.* Further, a careful assessment of the actual burden, in both the long and short run, on governmental activities and the alternatives available ought to be made.[37]

The third interest to evaluate, consistent with the approach in *Baker,* should be the court's capacity for deciding the case. The Court should consider, whether the vehicle of a tort suit provides the relevant standard of care, be it professional or reasonableness, for the evaluation of the governmental decision. *Hendry v. United States*, 418 F.2d at 783. Similarly, the court should determine whether the factors for decision are primarily of such political, social or economic nature as to be beyond the court's experience gained even in civil rights and antitrust litigation. *See, e. g., Blessing v. United States*, 447 F.Supp. at 1183–85. On this point, complexity alone is not dispositive, but rather the Court should assess the nature of the complications and their amenability to the judicial process of evidential offering, evaluation and determination. *See Griffin v. United States*, 500 F.2d at 1064.

## V.

Having investigated the mechanical details of the Parole Board's decisionmaking process, and formed an analytical framework for section 2680(a) determinations, we are brought to the application of the alleged facts to this framework and the policy considerations raised. The appellants' losses sustained by the brutal rape, murder and mutilation of their wife/mother can only be described as severe and isolated. Such loss is difficult to justify as the risk of almost any governmental activity.[38] Further, they, as members of the public, have the right to expect vigorous governmental efforts to protect against such occurrences. Indeed, the expectation that the Board will act consistently with the protection of society and its welfare is expressed in the parole statute itself. *See* 18 U.S.C. § 4203(a) (1970). Alternative remedies such as life insurance would appear to constitute inadequate compensation in light of the brutal nature of appellants' decedent's death. Nor does a federal victim of crimes compensation program exist. Therefore, the seriousness of appellants' loss gives rise to the need for a close and careful examination of the competing governmental interests.[39]

36. A similar approach has been adopted by several states. For example, a four–pronged preliminary test to identify discretionary functions was announced by the Washington Supreme Court in 1965 and adopted by the Florida Supreme Court in 1979. *See Evangelical United Brethren Church v. State*, 67 Wash.2d 246, 407 P.2d 440, 445 (1965); *Commercial Carrier Corp. v. Indian River County*, 371 So.2d 1010, 1019 (Fla.1979); *Bellavance v. State*, 390 So.2d 422, 423–424 (Fla. 1 D.C.A. 1980). The test is:

> (1) Does the challenged act, omission, or decision necessarily involve a basic governmental policy, program, or objective? (2) Is the questioned act, omission, or decision essential to the realization or accomplishment of that policy, program, or objective as opposed to one which would not change the course or direction of the policy, program, or objective? (3) Does the act, omission, or decision require the exercise of basic policy evaluation, judgment, and expertise on the part of the governmental agency involved? (4) Does the governmental agency involved possess the requisite constitutional, statutory, or lawful authority and duty to make the challenged act, omission, or decision? If these prelimi-

> nary questions can be clearly and unequivocally answered in the affirmative, then the challenged act, omission, or decision can, with a reasonable degree of assurance, be classified as a discretionary governmental process and nontortious, regardless of its unwisdom. If, however, one or more of the questions call for or suggest a negative answer, then further inquiry may well become necessary, depending upon the facts and circumstances involved.

> 407 P.2d at 445.

37. *See* Note, *supra* note 25 at 980. *See also Bellavance v. State*, 390 So.2d at 423–24.

38. We do not implicate the decisions made under 28 U.S.C. § 2674 which bar liability for injuries to servicemen arising out of or in the course of activity incident to military service. *See Stencel Aero Engineering, Corp. v. United States*, 431 U.S. 666, 97 S.Ct. 2054, 52 L.Ed.2d 665 (1977), *Feres v. United States*, 340 U.S. 135, 71 S.Ct. 153, 95 L.Ed. 152 (1950); *Johnson v. United States*, 631 F.2d 34, 35 (5 Cir. 1980). Much of the cost for such losses are handled through direct government intervention.

39. *See Bellavance v. State*, 90 So.2d at 324–25. Actions for speculative or intangible losses

The present administration of the parole system, as noted above, is carried on in a somewhat ministerial fashion at a low level within the agency. The process requires the hearing examiner to review the records, add up pre–identified salient characteristics of the offender and to compare this to a largely predetermined offense severity rating in order to find the appropriate time frame for release. If not a totally fixed and mechanical process, this certainly comes very close to being decisionmaking between "the limits of positive rules . . . subject to . . . review". *Dalehite v. United States,* 346 U.S. at 34, 73 S.Ct. at 967. In this regard, appellant alleges the Parole Board's failure to obtain and read all records required by the regulations to be considered, i. e. Whisenhant's psychiatric evaluations. This is a mandatory requirement placed on hearing examiners by the Board and not a policy–making function. *See* 28 C.F.R. § 2.19; *Jones v. Johnson,* 402 F.Supp. 992, 998–99 (E.D.Pa.1975). Therefore, without further analysis, seeking relief for the failure to proceed in accordance with the agency's own regulations does not appear to raise significant separation of powers problems so as to preclude the action under the discretionary function exemption. *See United Air Lines, Inc. v. Wiener,* 335 F.2d 379, 394 (6th Cir. 1974).

Appellant also alleges, in the alternative, that the Board simply disregarded the psychiatric evaluations of Whisenhant as a homicidal psychotic likely to repeat his brutal behavior. This allegation implicates the decisionmaking process most directly and therefore raises separation of powers issues. The government has taken the position that even if the Board knew Wisenhant would go on such a hideous rampage as occurred it still had the discretion to release him and remain protected from liability under section 2680(a). This cannot be true!

The Board's discretion to release is limited both by the threshold time–served eligibility criteria of 18 U.S.C. § 4202 (1970) and the duty to establish "a reasonable probability that such prisoner will live and remain at liberty without violating the laws" and to form an opinion that "such release is not incompatible with the welfare of society." 18 U.S.C. § 4203(a) (1970). *See deVyver v. Warden, U. S. Penitentiary,* 388 F.Supp. 1213, 1218–20 (M.D.Pa.1974). *See also Merchants Nat. Bank & Trust Co. of Fargo v. United States,* 272 F.Supp. 409, 415–19 (D.N.D.1967). Congress was concerned and under the statute, there is a duty to act in good faith to society.[40] Certainly a release in total disregard of known propensities for repetitive brutal behavior is not an abuse of discretion but rather an act completely outside of clear statutory limitations.

The Supreme Court reached a similar conclusion in *Hatahley v. United States,* 351 U.S. 173, 76 S.Ct. 745, 100 L.Ed. 1065 (1956). In this action, Navajo Indians sued under the FTCA to recover for confiscation and destruction by federal agents of their horses grazing on federal lands. The agents claimed the protection of section 2680(a) while acting pursuant to the Utah abandoned horse statute, knowing that the horses were not abandoned and to whom the horses belonged. *Id.* at 179–81, 76 S.Ct. at 750–51. The court held that these wrongful trespasses did not involve discretion or even abuse thereof and that the claim was compensable under the FTCA. *Id.* at 181, 76 S.Ct. at 751. Therefore, the government's position in this action cannot be maintained.

The question then becomes, where does the discretion of the Parole Board lie? It is important to note at this point that the allegations attack only the application of the Parole Board's guidelines to Whisen-

---

might well constitute mere harassment of governmental policies and programs.

**40.** *See Grimm v. Arizona Board of Pardons & Paroles,* 115 Ariz. 260, 267, 564 P.2d 1227, 1234 (1977) (Board members have duty to public to avoid grossly negligent release of highly dan-

gerous prisoners); *Restatement (Second) of Torts,* § 319 (1965). *Cf. Gullatte v. Potts,* 630 F.2d 322, 322–23 (5th Cir. 1980) (placing of "snitch" in general prison population was action so likely to produce injury as to be substantially certain and to raise an ordinary tort to level of constitutional violation).

hant and not the guidelines themselves. The exercise of policy–making discretion by the Board occurred in formulating and implementing the guideline criteria and matrix. See Hendry v. United States, 418 F.2d at 782; Downs v. United States, 522 F.2d at 997. See also Johnson v. State, 69 Cal.2d 782, 73 Cal.Rptr. 240, 250, 447 P.2d 352, 362 (1968). The decision to reject the rehabilitative approach of previous parole evaluations and to adopt the present system was one fraught with social, political and limited resource allocation policy considerations. Such "policy" decisions, whether good or bad, are probably exempt under Dalehite. But surely the application of these guidelines to Whisenhant is not. Such an act has none of the political policy overtones that exist in certain law enforcement situations, such as enforcing integration.[41] Compare United States v. Faneca, 332 F.2d 872 (5th Cir. 1964), cert. denied, 380 U.S. 971, 85 S.Ct. 1327, 14 L.Ed.2d 268 (1965) and DePass v. United States, 479 F.Supp. 373, 376–77 (D.M.D.1979), with Downs v. United States, 522 F.2d 920 (6th Cir. 1975). The choices involved in applying the guidelines and releasing a particular person are of another sort. Whether characterized as "operational", "day–to–day" or by some other label, they do not achieve the status of a basic policy evaluation and decision.[42] Such decisions, if negligent, are not protected by section 2680(a).

Appellants' allegations as to improper parole supervision or failure to formulate adequate conditions of parole as nondiscretionary actions are not without precedent. In Underwood v. United States, 356 F.2d 92 (5th Cir. 1966) this Court determined that the negligent discharge without restrictions, of a mental patient made without adequate consideration of the patient's history by the releasing psychiatrists, was actionable and not protected by section 2680(a). Id. at 98. See Merchant's Nat. Bank & Trust Co. of Fargo v. United States, 272 F.Supp. 409, 411–14 (D.N.D. 1967). The alleged actions of the Parole Board in this case are not meaningfully distinguishable.

■ There exists a growing body of authority which has recognized both the duty to properly supervise patients/parolees who are dangerous to themselves or others,[43] see Rieser v. District of Columbia, 563 F.2d 462, 475 (D.C.Cir.1977) (en banc); White v. United States, 317 F.2d 13, 16–18 (4th Cir. 1963) and to advise the appropriate officials of their release, Semler v. Psychiatric Institute of Washington, D. C., 538 F.2d 121, 127 (4th Cir. 1976), or to warn potential victims see Fair v. United States, 234 F.2d 288, 291–94 (5th Cir. 1956); Merchants Nat. Bank & Trust Co. of Fargo v. United States, 272 F.Supp. 409, 418 (D.N.D.1967); Tarasoff v. Regents of University of California, 45 L.W. 2046, 2046 (Cal. July 1, 1976); Johnson v. State, 447 F.2d 352, 355, 360 (Cal.1968) (en banc); Goergen v. State, 196 N.Y.S.2d 455, 457–62, 18 Misc.2d 1085 (Ct.Cl.N.Y. 1959). These decisions are consistent with a recognized public duty, or individualized special duty based on the circumstances of the case, to protect society from harm in the execution of policy once it has been

---

**41.** To state the obvious, criminal incarceration is not a question solely in the providence of a single branch of government. Congress decides the broad or narrow limits for sentences and whether parole shall exist. The judiciary is required to sentence and has some role in certain releases. The executive administers the prison and parole system within its discretion. The roles played are not insular or discreet and other processes for reaching the same ends involving a different allocation of duties exist. See, e. g., Arthur & Karsh, Release Hearings: To Protect The Public! 40 Fed.Prob. 55 (Sept. 1976).

**42.** See, e. g., Johnson v. United States, 516 F.2d 606, 609 (5th Cir. 1978); Fair v. United States, 234 F.2d 288 (5th Cir. 1956); Merchants Nat. Bank & Trust Co. of Fargo v. United States, 272 F.Supp. at 418; Bellavance v. State, 90 So.2d at 323–24.

**43.** There is also a duty to protect the person in custody on a probationary status from injury by others, see, e. g., Rogers v. United States, 397 F.2d 12, 14–15 (4th Cir. 1968), or infants from the environment. See Bryant v. United States, 565 F.2d 650, 653 (10th Cir. 1977).

formulated.[44] While perhaps a high level allocation of manpower and financial resources or some other clear policy oriented decision may exempt the government from liability in particular cases, the facts of this case as alleged provide an insufficient basis for dismissal due to social, political or economic policy implications.

The burden upon governmental activity in this area due to judicial scrutiny and the possibility of tort liability warrants some discussion. It is significant that an FTCA action only involves governmental liability and not personal liability for negligent activities. Therefore, we doubt that the government's potential liability will be a significant inhibitor to the exercise of governmental decisionmaking.[45] Any financial uncertainty at the planning level can be budgeted for or covered by liability insurance. A variety of alternatives appears available.[46]

There are, of course, positive aspects to the imposition of liability. Accountability acts as an incentive for professional and efficient administration. Government employees should as a result, and consistent with the statutory duty imposed upon them, tend to articulate a basis for their decisions which serves the needs of society as well as those of the individual person and not act in an unbridled fashion. As government grows and the potential for harm due to its negligence increases, the need to compensate individuals bearing the full burden of that negligence also increases. Suits under the FTCA provide a fair and efficient means to distribute the losses as well as the benefits of a parole system.

The final aspect to be assessed, judicial review, in and of itself poses no threat to governmental processes. There is little risk of embarrassment from a condemnation of policies. Such are exempt. The potential for public embarrassment, in light of the grievous losses sustained by appellants, appears far greater from the exemption of liability in instances of wanton or negligent errors than from imposition of liability. Further, the only issue before the court in trying such actions would be the reasonableness of the injurious activity, not whether the best alternative was chosen. There is ample room for vigorous governmental implementation of policies when the only limit placed upon such activities is that officials do not act in a manner so unreasonable that no sensible well-intentioned person could accept it.[47]

We reach then, the judicial problems inherent in such cases, essentially the capacity of courts to decide and the amenability of the case to judicial processes.[48] While the decisions made by parole hearing examiners are somewhat unique, there is analogy available in the instance of release of dangerous mental patients from hospitals or custody. A tort suit utilizing either the reasonable man standard or a professional standard would appear to be the classic vehicle for analysis. See *Johnson v. State*, 447 P.2d at 363. Nor are the considerations too complex or intangible as to be beyond the court's experience developed in medical malpractice cases, integration and anti-trust litigation as well as long experience dealing with criminals and overzealous law enforcement officials. In sum, we conclude that there is no convincing argument, consistent with the mandates of *Indian Towing, Yellow Cab* and *Rayonier*, for the preclusion of subject matter jurisdiction, on the facts alleged, under 28 U.S.C. § 2680(a).

**44.** See Kutcher, *The Legal Responsibility of Probation Officers in Supervision*, 41 *Fed.Prob.* 35, 35–38 (March 1977); Note, *Parole Board Members Have Only Qualified Immunity For Decision to Release Prisoner*, 46 *Fordham L.Rev.* 1301, 1304–06 (1978); Note, *Parole Board Liability For The Criminal Acts of Parolees*, 8 *Capital U.L.Rev.* 149 (1978).

**45.** See *Bellavance v. State*, 90 So.2d at 324–25; Kutcher, *supra* note 44, at 36; Note, *supra* note 25, at 971.

**46.** See Note, *supra* note 25, at 972.

**47.** See Kimball & Newman, *Judicial Intervention in Correctional Decisions: Threat and Response*, 14 *Crim. & Del.* 1, 3–7 (1968); Breiter, *Controls in Criminal Law Enforcement*, 24 *U.Chi.L.Rev.* 427, 434 (1960). See also *Downs v. United States*, 522 F.2d 990, 998 (6th Cir. 1975).

**48.** See text Part IV, p. 143 *supra*.

## VI.

■ Turning to appellants' other allegations, although not extensively briefed or argued, we recognize that the arguments in regard to the United States Bureau of Prisons raise similar considerations as those made against the Board of Parole. In this vein, it appears that the duty of the Bureau of Prisons to provide adequate and complete records for parole determinations is also ministerial and not policymaking in nature. It is also well settled that once government officials decide to provide psychiatric treatment, the discretionary function exception no longer shields them from liability for the negligent provision of such medical services. *See, e. g., Underwood v. United States*, 356 F.2d 92, 98 (5th Cir. 1966); *White v. United States*, 317 F.2d 13, 17 (4th Cir. 1963); *Fair v. United States*, 234 F.2d 288, 293 (5th Cir. 1956); *United States v. Gray*, 199 F.2d 239, 241 (10th Cir. 1952). *Cf. United States ex rel. Fear v. Rundle*, 506 F.2d 331 (3d Cir. 1974), *cert. denied*, 421 U.S. 1012, 95 S.Ct. 2416, 44 L.Ed.2d 679 (1975). Even the discretion of the Attorney General and prison officials to classify and segregate prisoners is not unbounded. *See, e. g., United States v. Muniz*, 374 U.S. 150, 83 S.Ct. 1850, 10 L.Ed.2d 805 (1963); *Bowring v. Godwin*, 551 F.2d 44, 47 (4th Cir. 1977); *McCray v. Sullivan*, 509 F.2d 1332, 1334 (5th Cir.), *cert. denied*, 423 U.S. 859, 96 S.Ct. 114, 46 L.Ed.2d 86 (1975); *Carter v. United States*, 283 F.2d 200, 203 (D.C.Cir.1960); *Cohen v. United States*, 252 F.Supp. 679, 687 (N.D.Ga.1966), *rev'd on other grounds*, 389 F.2d 689 (5th Cir. 1967).

### CONCLUSION

For the reasons stated, we hold the allegations of the appellants' complaint do state a claim for relief. The order of dismissal is reversed and the case remanded for further proceedings consistent with this opinion.

### REVERSED AND REMANDED.