Christy COLE & Helen Cole, Plaintiffs,

v.

UNITED STATES of America,
Defendant.

No. CV 83–P–2100–W.

United States District Court,
N.D. Alabama, S.D.

May 6, 1986.

Jerry Shirley, Henley & Shirley, Northport, Ala., for plaintiff.

Frank W. Donaldson, U.S. Atty., Henry I. Frohsin, Asst. U.S. Atty., Birmingham, Ala., Patrick Cavanaugh, Dept. of Justice, Washington, D.C., for defendant.

### Memorandum of Opinion

POINTER, Chief Judge.

The plaintiffs bring this cause of action under the Federal Torts Claims Act (FTCA),[1] alleging that the United States has violated a post-service duty to warn a Navy veteran of the hazards of radiation to which he was exposed while on active duty. The question presented to the court is whether the discretionary function exception denies this court jurisdiction to adjudicate plaintiffs' claim. For the reasons discussed below the court concludes that it does, and so grants the defendant's motion to dismiss.

---

1. The FTCA waives the traditional sovereign immunity of the United States with respect to torts. Under the FTCA the government is liability for personal injury or property damage caused by the negligence of any government employee "acting within his scope or employment, under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred." 28 U.S.C. § 1346(b) (1976).

This action is also brought under the Public Vessels Act, 46 U.S.C. §§ 781–790, which incorporates the Suits in Admiralty Act, 46 U.S.C. §§ 741–752.

## I. BACKGROUND

In 1946 the Navy conducted the Bikini Atoll project in which an atomic bomb was detonated underwater with submarines used as test vessels. After the atomic test, the submarines were brought to the Mare Island Naval Shipyard, Vallejo, California, and became part of the United States Naval 19th Reserve Mothball Fleet. Robert E. Cole was assigned to the maintenance crew responsible for keeping the test vessels and other vessels afloat and in good condition. The maintenance crew every twenty-four hours walked through each of the vessels looking for leaks and damage. Since two of the submarines used in the atomic test were taking on water, the maintenance crew sometimes remained in the submarines for at least an hour in order to pump out the water. This routine continued for approximately three to six months, during which time the test vessels were inspected for radiation by various military and scientific agencies. In 1952 Cole received a medical discharge. On November 15, 1981, he was diagnosed at the Veterans Administration hospital in Birmingham, Alabama, as having mouth, throat, and prostate cancer. He received radiation treatment, a laryngectomy and a right radical neck dissection. He died on May 18, 1982.

Christy Cole, the daughter and personal representative of Robert Cole, and Helen Cole, his widow, after having their administrative claim rejected, brought suit on September 4, 1983, under the FTCA against the United States. The plaintiffs alleged that "the defendant knew or should have known, or subsequently discovered and fraudulently concealed, that Decedent's exposure, without Decedent's knowledge, to massive doses of dangerous radiation while ... a member of the U.S. Navy, posed a great likelihood or possibility of his developing carcinoma subsequent to this exposure, but failed to properly advise or inform Decedent of this danger during his lifetime," which was the proximate cause of his death.[2] The government responded by filing a motion to dismiss on the grounds that *Feres v. United States,* 340 U.S. 135, 71 S.Ct. 153, 95 L.Ed. 152 (1950), strips this court of subject matter jurisdiction.[3] Subsequently, the plaintiffs filed a motion to amend the complaint to include a count alleging that the government's knowledge of the hazards of radiation had so expanded, subsequent to Cole's discharge, to give rise to a new duty to warn.[4]

Upon reviewing the record, the court concluded that the original complaint was barred by *Feres* because the alleged negligent act—the failure to warn—occurred while Cole was in the Navy and merely continued after his discharge. The court viewed the plaintiffs' proposed amendment, which in essence bifurcated the duty to warn into one that arose while Cole was on

---

**2.** Count One reads:

The Defendant knew or should have known, or subsequently discovered and fraudulently concealed, that Decedent's exposure, without Decedent's knowledge, to massive doses of dangerous radiation while performing the aforesaid duties while a member of the U.S. Navy, posed a great likelihood or possibility of his developing carcinoma subsequent to this exposure, but failed to properly advise or inform Decedent of this danger during his lifetime.

In Count II the plaintiffs also charged that the medical staff at the Veterans Hospital committed assault and battery when treating Cole. Both allegations were made in the administrative claim filed with the Department of Navy. The assault and battery charge was dismissed by this court and upheld by the Eleventh Circuit.

**3.** In a nutshell, the *Feres* doctrine precludes persons from suing the government for injuries or

fatalities resulting from negligent acts that "arise out of or are in the course of activity incident to (military) service." 340 U.S. at 146, 71 S.Ct. at 159.

**4.** The proposed amendment contained the following count:

Subsequent to Decedent's exposure, and subsequent to Decedent's separation from the U.S. Navy, Defendant's knowledge of the harmful effects of radiation exposure expanded greatly to the point where a new duty to treat or warn the Decedent of the hazards of radiation arose. Notwithstanding Defendant's increased knowledge of the hazard to the Decedent and its duty to warn, the Defendant failed to properly advise or inform the Decedent of the hazard he incurred following his separation from military service.

active duty and one that arose after his discharge, as an inventive, artful, but impermissible attempt to avoid the *Feres* doctrine. Accordingly, the plaintiffs' motion to amend was denied and the government's motion to dismiss was granted.

On appeal the Eleventh Circuit remanded, reversing in part and affirming in part the court's ruling. It concluded that, while the original complaint alleged a continuing tort and was correctly dismissed, the proposed amendment alleged a separate and distinct cause of action not barred by *Feres* since the negligent act—the duty to warn—was alleged to have occurred after Cole was discharged from the Navy.

■ The case, now back before the court, has been pared down to the single allegation that the government violated a duty to warn imposed by its increased knowledge of the hazards of radiation which occurred after Cole was discharged.

The government moves again to dismiss on the grounds, *inter alia*,[5] that the discretionary exception precludes the plaintiffs' claim.

## II. DISCRETIONARY FUNCTION EXCEPTION

The FTCA is often recognized as "the offspring of a feeling that the Government should assume the obligation to pay damages for the misfeasance of employees in carrying out its work."[6] In theory the FTCA waives the sovereign immunity of the entire Federal government. But the practical import of the principle is that the executive and legislative branches and the various regulatory agencies are sued while the judiciary sits in judgment. Thus, the judicial branch, though not itself a frequent object of suit under the FTCA, must be sensitive to the possibility of interference in the internal affairs—the policy-making

---

**5.** The defendant also asserts that the case should be dismissed or summary judgment granted because (1) the plaintiffs have failed to exhaust their administrative remedies; (2) the facts do not give rise to a post-discharge duty to warn; and, (3) Alabama law does not recognize such a duty.

The court is unmoved by the government's argument that since the plaintiffs did not allege a post-discharge tort in their administrative claim that they are barred from raising it now. A prerequisite for bringing any suit under the FTCA is that the plaintiff first file his claim with the appropriate governmental agency as required by 28 U.S.C. § 2675(a). It is well-settled that § 2675(a) is jurisdictional, *Molinar v. United States,* 515 F.2d 246 (5th Cir.1975), and that a litigant may not base any part of a tort action against the United States on claims not presented to the appropriate administrative agency. *Provancial v. United States,* 454 F.2d 72 (8th Cir.1972).

In enacting § 2675(a), Congress sought to ensure that plaintiffs would "promptly inform the relevant agency of the circumstances of the accident so that it may investigate the claim and respond either by settlement or by defense," *Adams v. United States,* 615 F.2d 284, 289 (5th Cir.1980), which would ultimately work to "ease court congestion and avoid unnecessary litigation." S.Rep. No. 1327, 89th Cong., 2d Sess. 2516 *reprinted in* (1966) U.S. Code Cong. & Ad. News, pp. 2515, 2516. As noted in *Rise v. United States,* 630 F.2d 1068, 1071 (5th Cir.1980), "(t)his purpose will be served as long as a claim

brings to the Government's attention facts sufficient to enable it thoroughly to investigate its potential liability and to conduct settlement negotiations with the claimant." Such is the case here. The claim, as put forth by the plaintiff, was sufficient in that the government could—and did—infer a possible allegation of liability for a post-discharge failure to warn, as evidenced by the Department of Navy's letter rejecting the administrative claim, which specifically addressed a post-discharge failure to warn claim.

Nor are the facts indisputable that the government's knowledge of the hazards of radiation exposure did not, subsequent to Cole's discharge in 1953, increase to such a degree as to give rise to a post-discharge duty to warn. For example, the reason given by the government for starting the Nuclear Test Personnel Review Program in 1977—the findings of a preliminary study conducted by the Center for Disease Control indicating possible health hazards associated with low level radiation—on its face conflicts with the position today taken by the government that it always knew of these health hazards.

Last, the court observes that both parties operate under the assumption that the law of Alabama determines whether the government had a legal duty to warn Cole. The court finds it unnecessary in this opinion to hold whether the Alabama Supreme Court would recognize a post-discharge duty to warn.

**6.** *Dalehite v. United States,* 346 U.S. 15, 24, 73 S.Ct. 956, 962, 97 L.Ed. 1427 (1953).

process—of the other branches.[7] In response to this concern, Congress explicitly excluded from the FTCA any claim "based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused." 28 U.S.C. § 2680(a).

Courts have found it a difficult task to map with accuracy the contours of the discretionary function exception. In *Dalehite v. United States,* 346 U.S. 15, 73 S.Ct. 956, 97 L.Ed. 1427 (1953), the Supreme Court labored to provide a workable definition of this exception. The Court grappled with the issue of whether the government was liable for a disastrous explosion of ammonium nitrate fertilizer, produced and distributed under the direction of the United States and intended for export to devastated areas occupied by the Allied Armed Forces after World War II. Most of Texas City, Texas, was razed and over two hundred people were killed. The negligent acts alleged by the plaintiffs ranged from the cabinet-level decision to institute the fertilizer export program and the failure to experiment with the fertilizer to determine the possibility of explosion, to the drafting of the basic plan of manufacture and the failure to properly police the storage and loading of the fertilizer.

Reasoning that the exception protects "the discretion of the executive or the administrator to act according to one's judgment of the best course of action," *Id.* at 34, 73 S.Ct. at 967, the Court stated:

> It is unnecessary to define, apart from this case, precisely where discretion ends. It is enough to hold, as we do, that the 'discretionary function or duty' that cannot form a basis for suit under the Tort Claims Act includes more than the initiation of programs and activities. It also includes determinations made by executives or administrators in establishing plans, specifications or schedules of operations. Where there is room for policy judgment and decision there is discretion. *Id.* at 35–36, 73 S.Ct. at 968.

The Court concluded that the government was not liable for any of the allegedly negligent acts because "the decisions ... were all responsibly made at a planning rather than operational level and involved considerations more or less important to the practicability of the Government's fertilizer program." *Id.* at 42, 73 S.Ct. at 971.

As a result of *Dalehite,* . some courts have employed the "planning/operational" dichotomy when assessing whether a challenged governmental activity falls within the discretionary function exception. *See Jackson v. Kelly,* 557 F.2d 735, 737 (10th Cir.1977); *Payton v. United States,* 636 F.2d 132, 143 (5th Cir.1981); *United States v. State of Washington,* 351 F.2d 913 (9th Cir.1965); *White v. United States,* 317 F.2d 13 (4th Cir.1963); *Mahler v. United States,* 306 F.2d 713 (3rd Cir.1962); *cert. denied,* 371 U.S. 923, 83 S.Ct. 290, 9 L.Ed.2d 231 (1962); *United States v. Union Trust,* 350

---

7. The court in *Payton v. United States,* 636 F.2d 132, 143 (5th Cir.1981) remarked that "(t)he crux of the concept embodied in the discretionary function exception is that of separation of powers." In *Blessing v. United States,* 447 F.Supp. 1160, 1170 (E.D.Pa.1978) this point was elaborated on:

> Read as a whole and with an eye to discerning a policy behind this (discretionary function exception), it seems to us only to articulate a policy of preventing tort actions from becoming a vehicle for judicial interference with the decision-making that is properly exercised by other branches of the government and of protecting "the Government from liability that would seriously handicap efficient government operations" ... Statutes, regulations,

and discretionary functions, the subject matter of 2680(a), are, as a rule, manifestations of policy judgments made by the political branches. In our tripartite governmental structure, the courts generally have not substantive part to play in such decisions. Rather the judiciary confines itself ... to adjudication of facts based upon discernible objective standards of law. In the context of tort actions, ... these objective standards are notably lacking when the question is not negligence but social wisdom, not due care but political practicability, not reasonableness but economic expediency. Tort law simply furnishes an inadequate crucible for testing the merits of social, political, or economic decisions.

U.S. 907, 76 S.Ct. 192, 100 L.Ed. 796 (1955). Other courts have veered slightly from this approach, concerned that it too often relies on the status of the official making a judgment. They instead have focused on whether the judgments of a government employee are of "the nature and quality" which Congress intended to put beyond judicial review, and weighted the policies underlying the discretionary function exception against those served by the FTCA. *Downs v. United States,* 522 F.2d 990, 997 (6th Cir.1975); *See also Smith v. United States,* 375 F.2d 243, 246 (5th Cir.1967), *cert. denied,* 389 U.S. 841, 88 S.Ct. 76, 19 L.Ed.2d 106 (1967).

The latter approach has apparently been embraced by the Supreme Court in *United States v. S.A. Empresa De Viacao Arerea Rio Grandense (Varig Airlines),* 467 U.S. 797, 104 S.Ct. 2755, 81 L.Ed.2d 660 (1984). In one of the two cases considered in *Varig Airlines,* a commercial aircraft owned by Varig Airlines was making a transatlantic flight when a fire erupted in one of the lavatories. One hundred and twenty-four people on board died from asphyxiation or the effects of the toxic gases produced by the fire. The aircraft was severely damaged by a crash landing.

Both Varig Airlines and the families and personal representatives of many of the passengers brought suit against the United States under the FTCA. They asserted that the fire began in the towel disposal area located below the sink unit in the lavatory and that this area was not capable, as it was certified by the Civil Aeronautics Agency (CAA) to be, of containing the fire. Pointing to the air safety regulations promulgated by the CAA requiring waste receptacles to be made of fire-resistant materials and to have covers or other provision for containing possible fires, the plaintiffs claimed that the CAA was negligent when it inspected the aircraft and certified it as meeting minimum safety standards. The district court granted summary judgment for the United States on the grounds that, *inter alia,* recovery was barred by the discretionary function exception. The Ninth Circuit reversed, holding that the inspection of the aircraft for compliance with air safety regulations was a function not entailing the sort of policy-making discretion contemplated by the discretionary function exception.

In the companion case, John Dowdle owned an aircraft that caught fire in midair and crashed, killing everyone aboard. Dowdle and his insurance company filed suit against the United States seeking damages for the destroyed aircraft. The plaintiffs asserted that the fire, originating in the forward baggage compartment of the airplane, was caused by the faulty installation of a heater certified as safe by the Federal Aviation Administration (FAA) when it was not. The district court, upon remand, found the United States liable and the Ninth Circuit Court of Appeals affirmed.

The respondents argued that the discretionary function exception expressed in *Dalehite* had been implicitly rejected by *Indian Towing Co. v. United States,* 350 U.S. 61, 76 S.Ct. 122, 100 L.Ed. 48 (1955), and *Union Trust Co. v. Eastern Air Lines, Inc.,* 350 U.S. 907, 76 S.Ct. 192, 100 L.Ed. 796 (1955). Unpersuaded by this argument, the Court reiterated that *Dalehite* is still the law of the land. The Court noted, in an effort to sharpen the *Dalehite* opinion, that attention must focus on the Congressional intent surrounding the enactment of the discretionary function exception, which is to "prevent judicial second-guessing of legislative and administrative decisions grounded in social, economic, and political policy through the medium of an action in tort." 104 S.Ct. at 2675.

The Court then analyzed the decision connected to the alleged negligent acts: the decision by the Secretary of Transportation to implement a system of "spot-checks" for issuing certifications.[8] The

---

**8.** The Court observed that § 1421(a)(3)(C) specifically empowers the Secretary to establish and implement a mechanism for enforcing compliance with minimum safety standards according to her judgment of the best course. The "spot-check" system, which was adopted by the

Court opined that the decision to use a program of "spot checking" for determining manufacturers' compliance with minimum safety standards is plainly a discretionary activity of the "nature and quality" protected by § 2680(a) because it involves a decision to "accommodate the goal of air transportation safety and the reality of finite agency resources." *Id.* Moreover, the acts of FAA employees in executing the "spot-check" program were also found by the Court to be protected. They were specifically empowered to make policy judgments regarding the degree of confidence that might reasonably be placed in a given manufacturer, the need to maximize compliance with FAA regulations, and the efficient allocation of agency resources.

## III. ANALYSIS

■ *Varig Airlines* counsels this court to probe the governmental decision associated with the alleged negligent act for policy considerations. For immediate purposes, the court will view the facts and the law in this case in a light most favorable to the plaintiff by assuming that the government was burdened with a post-discharge duty to warn but simply decided not to discharge that duty. Thus, the issue becomes whether the government's decision not to warn was imbued with policy considerations. The court concludes that it was.

If the government owed a duty to warn to the plaintiff, then a similar duty was owed to *all* servicemen exposed to radiation while on active duty who retired on or before the year the duty arose.[9] A program to warn the plaintiff and the thousands of others similarly situated would, in all likelihood, have resembled the program that the government has subsequently established. The Nuclear Test Personnel Review Program (NTPRP), instituted in 1977 allegedly in response to the findings of a preliminary study by the Centers for Disease Control which identified a possible leukemia cluster among participants in the 1957 Nevada test, Shot Smoky, was charged with warning veterans who were exposed to radiation of possible health hazards and providing medical examinations.[10]

In the opinion of the court, a probing of the decision establishing the NTPRP for policy components is unnecessary. The decision to create a public program, such as the NTPRP,[11] is in its very essence a policy

Secretary, is premised on the notion that the duty to ensure that an aircraft conforms to FAA safety regulations lies with the manufacturer and operator, while the FAA retains the responsibility for policing compliance. Thus, the frequency and degree of "spot checking" of certain aircraft by inspectors hinges on the manufacturer's past history, policies, quality control procedures, inspection personnel, equipment and facilities, factors recognized in the FAA's manuals.

9. More than 250,000 military and civilian personnel between 1945 and 1962 were involved in over 235 atmospheric nuclear tests conducted by the Atomic Energy Commission. See Memorandum of Secretary of the Army, Secretary of the Navy, and Secretary of the Air Force from Vice-Admiral R.R. Monroe, dated February 13, 1978, re: "DoD Personnel Participation in Atmospheric Nuclear Weapons Testing," (Exhibit 19).

10. The program's initial task was to document information on each atmospheric test, the participating personnel and the possible amounts of radiation that to which they were exposed. In early 1978 it was anticipated that some test participants—those whose exposure records indicated that they had received significant dos-

es—would be notified and appropriate medical follow-up would be provided. In March 1979 a notification and medical examination program was commenced for all Department of Defense test participants with cumulative exposures from atmospheric testing in excess of 25 rem. The 25 rem threshold was selected because it was the current Federal guideline for one time planned exposures to radiation under emergency conditions. See Memorandum of Secretary of the Army, Secretary of the Navy, and Secretary of the Air Force from Vice-Admiral R.R. Monroe, dated February 13, 1978, re: "DoD Personnel Participation in Atmospheric Nuclear Weapons Testing," (Exhibit 19).

11. In *In Re Consolidated U.S. Atmospheric Testing Lit.,* 616 F.Supp. 759, 775–76 (D.C.Cal.1985), the decision to implement the NTPRP was found to fall within the discretionary function exception:

The decision to embark on (the NTPRP) entailed a commitment of substantial resources, including the assignment of a large number of employees and the expenditure of large sums of money. The initial cost of the NTPRP alone was $6,000,000 per year. The program

decision. Public programs are one of the primary vehicles used by the government for providing for the general welfare of its citizens. Efficacious operation of the government would be severely hampered if it were liable under the FTCA for decisions to create—or not to create—public programs, as the government and its employees would be susceptible to an endless stream of litigation contrary to the purpose of the discretionary function exception. Clearly, such decisions are of the nature and quality that Congress intended to insulate from "judicial second-guessing." [12]

## IV. CONCLUSION

Accordingly, the court finds that it is divested by the discretionary function exception of jurisdiction to adjudicate the claim of the plaintiffs. A separate order to this effect shall be entered.

required difficult judgments balancing the magnitude of the risk from radiation exposure—of which there was only fragmentary knowledge—against the risks and burdens of a public program. Those risks included the potential consequences of creating public anxiety and the health hazards inherent in the medical responses to the warning.

Thus any decision whether to issue warning to thousands of test participants of possibly life-threatening dangers and to provide them with appropriate examinations and counseling calls for the exercise of judgment and discretion at high levels of government. The difficulty of such decisions is illustrated simply by the problem of how to phrase such a warning where the degree of exposure of any particular participant and the consequent risk is not known. A decision must also take into account sensitive questions concerning its impact on on-going and future tests and on the military and civilian participants.

... Courts cannot be considered qualified to evaluate such a decision and any attempt to do so is likely to interfere with important governmental activities. Formulating and issuing warnings requires the government "to establish priorities for the accomplishment of its policy objects by balancing the objectives against the practical considerations as staffing and funding." *Varig*, 104 S.Ct. at 2768.... The conclusion is inescapable that every aspect of a warning program is a matter that falls within the discretionary function exception ...

12. As *the Supreme Court remarked:*
... the Tort Claims Act includes more than the initiation of programs and activities ... *Dalehite*, 346 U.S. at 35, 73 S.Ct. at 967.